Eugene M. BAZAAR et al., Plaintiffs-
Appellees,

v.

Porter FORTUNE et al., Defendants-
Appellants.

No. 72–2175.

United States Court of Appeals,
Fifth Circuit.

Feb. 27, 1973.

Rehearing and Rehearing En Banc
Granted May 9, 1973.

Heber Ladner, Jr., Sp. Asst. Atty. Gen. of Miss., A. F. Summer, Atty. Gen., Jackson, Miss., for defendants-appellants.

William P. Joyner, Alix H. Sanders, Oxford, Miss., for plaintiffs-appellees.

Before JOHN R. BROWN, Chief Judge, and THORNBERRY and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This appeal grows out of a confrontation between students and officials at the University of Mississippi over the content of a certain issue of the student literary publication *Images*. The District Court for the Northern District of Mississippi entered a temporary restraining order prohibiting the University from interfering with the publication and distribution of this magazine. This court, to avoid publication which would moot the serious legal issue involved, issued a stay of that temporary restraining order pending review of the case on the merits. After careful consideration, we affirm the decision of the district court ordering the University of Mississippi not to interfere with the publication and distribution of this magazine.

I.

The magazine in question, *Images*, is a University chartered and recognized student publication at the University of Mississippi. Since its conception in 1969, *Images* has published several issues on a more or less irregular basis. The magazine was designed for presentation of student-written and student-edited literary compositions.

The relationship of the University of Mississippi to this student publication has been gleaned by this court after careful examination of the record. Interdepartmental communications between officials of the University establish that *Images* was to be a student literary journal published with the advice of the English department. The publication was to be reproduced at the University's central duplicating facility, with an anticipated press run of 500 copies. The 1969 costs for this service was set at approximately $300.00. From the outset it was understood by all that the amounts collected from sales of the magazine would be used to offset, hopefully *in toto*, this printing cost. Student editors and faculty members would, of course, contribute their time and effort without remuneration. There was a further provision that in the event the sales of the magazine fell short of recouping the total publication cost, the English department would underwrite any loss from its current activities budget. There is also evidence that the magazine, at least for this past academic

year, received a $400.00 grant from the Associated Student Body Activities Fund, which is, in turn, collected from student fees.

In actual operation, the magazine was staffed and run by students with editorial advice from an English department appointed adviser, Dr. Evans Harrington, Professor of English at the University. The magazine was closely connected with a course in creative writing maintained as a regular portion of the English department's curriculum and taught by Professor Harrington. It was intended that the core of student materials for publication in *Images* come from student efforts in this creative writing course with the possible use of other student submitted materials. The magazine was apparently not designed for widespread circulation, but rather was to be limited to approximately 500 copies per issue and to be offered for sale primarily to students at the University through University bookstore facilities.[1]

## II.

Until the issue of *Images* set for publication in the spring of 1972, there had apparently been no conflict between University officials and the magazine's editorial board and no attempts of censorship or control by the University's hierarchy.[2] After the spring issue had been edited into final form and sent to central duplicating, however, a dispute arose. The superintendent of the University's printing facilities informed Chancellor Porter Fortune that the University should take a close look at the stories to be published. The Chancellor then acted to hold up binding and distribution of the spring issue. He formed a committee consisting of the deans of the various University departments which was to determine if the material in the magazine was suitable for publication. It is not very clear in the record what types of hearings or evaluation this committee gave the magazine. There are allegations that it consistently refused to receive statements from the students or from their adviser, Professor Harrington. This panel of deans decided that publication would be "inappropriate", apparently basing its decision on matters of "taste". The University then refused to finish binding the journal or allow its distribution.

The reluctance of the University to allow the publication and distribution of this magazine centers on two short stories which are contained in the issue.[3] Both stories were originally written by a student in the creative writing course for presentation and criticism by the class. The themes of the two stories are interracial love and black pride. The author of the stories is an 18-year-old regularly-enrolled black student at the University of Mississippi.[4] In framing its objections to the stories, the University was careful to disclaim any unhappiness with the presented themes. Rather, the University based its entire objection to both stories solely upon the grounds of the inclusion therein of what must be termed some quite "earthy" language. It appears to be the University's position that because of its connection with this magazine it has the right to prevent publication and distribution solely because it has determined that this language is inappropriate and in bad taste.

## III.

It is necessary to have a clear grasp of the nature of the stories, their char-

1. There was evidence that there was a mailing list of about 25 subscribers with the rest of the magazines to be sold on campus. It was admitted that commercial success was not an aim of the publication.

2. Evidence at the hearing below established that the University had no rules or regu-
lations on the content of student publications, and that the University had never in the past attempted to prevent publication of a student periodical.

3. In addition to these stories, the issue contained several poems and illustrations.

4. Although only eighteen, the author was classified as a first semester junior.

acters, and the manner in which the language found objectionable by the University is used. The objectionable portions consist of what are commonly known as "four-letter words", often colloquially referred to as "obscenities". They include use of "that four-letter word" generally felt to be the most offensive in polite conversation. While the University does not specify which words it most objects to, we assume that this epithet and its derivatives are high on the list. We feel that it is imperative, however, to stress the manner in which these words are used and the alleged literary justification for their use.

The protagonist of each story is a black male growing up in and confronted by a basically white society. Each of the two "heroes" is suggestive of a latter-day, black Holden Caulfield,[5] struggling to find himself in the world. As what could be termed a natural and necessary phase of character development, the "heroes" of these stories occasionally talk and think in a vernacular which is definitely not suited for parlor conversation.

It must be realized that these characters are young blacks who often express themselves by using somewhat crude epithets of the street. The language, while admittedly unacceptable in some quarters, is readily recognized as commonplace in various strata of society, both black and white. The tendency to use such language would seem more prevalent among young males in less-favored social groups of all races. In short, it could well be considered strained and artificial for these characters to speak and think in proper prep school diction.

We also note that the language is not used in a manner which would be termed "pandering". The words are not used in a sexual sense nor are there vulgar passages describing such activities. Throughout the work, the "offensive" words are usually used as modifiers strictly included for their effect and to convey a mood. They are not used in any literal sense. While some may feel that they are used a bit too often, this is a difficult matter to judge and rests largely with individual taste. Certainly, it seems an unsuitable standard for governmental censorship.

Thus, the sole question presented in this case is whether or not a university, under these circumstances, may prevent publication and distribution of a student publication solely on grounds of "taste" and "appropriateness" merely because certain words appear therein, no matter in what context and for what reasons the words are used.

### IV.

It is well established that not all rights to freedom of speech and the press are lost by those who attend state-supported colleges and universities. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). In this case it has become incumbent on the University of Mississippi to justify the censorship it has sought to exercise herein. Despite several rather ingenious arguments put forth by the University, we feel their efforts have failed. We find it necessary to address only two specific issues in this opinion. First, does the University here have the status of a private publisher with the right to choose what it will or will not publish. Secondly, if this special status cannot be afforded the University, has the University demonstrated sufficient "special circumstances" to justify censorship.

### The University as Publisher

The facts before us in this case do not establish the University's claim that it here stands in the shoes of a private publisher. The evidence shows that the University's financial connection with this endeavor was somewhat tenuous. There was no special appropriation for this magazine. Rather, as envi-

5. Salinger, J. D., *The Catcher in the Rye.*

sioned from the outset, it was intended to be self-supporting, with the University supplying printing facilities, more or less on open account, with the costs for such services to be repaid from sale proceeds. The English department, it is true, agreed to underwrite any loss out of current funds, but this was expected to be irregular, small, and indeed hopefully never necessary. Furthermore, part of the financing for this current year came as a separate grant from the student activity funds of the Associated Student Body. As to considerations other than monetary, the University points to the fact that this publication will bear a statement saying that it is published by students at the University with the advice of the English department. We do not feel that this simple statement, even if joined with the somewhat speculative financial connection, is enough to equate the University with a private publisher and endow it with absolute arbitrary powers to decide what can be printed.

 Moreover, there is a more basic reason why the University cannot be accorded the omnipotent position it seeks. The University here is clearly an arm of the state and this single fact will always distinguish it from the purely private publisher as far as censorship rights are concerned. It seems a well-established rule that once a University recognizes a student activity which has elements of free expression, it can act to censor that expression only if it acts consistent with First Amendment constitutional guarantees. As was stated in American Civil Liberties Union of Virginia v. Radford College, 315 F.Supp. 893 (W.D.Va., 1970):

> There have been a number of cases in the last several years involving Con-

stitutional challenges on first amendment grounds to the actions of college administrators. A perusal of these cases makes clear a recurring theme that once a public school makes an activity available to its students, faculty, or even the general public, it must operate the activity in accord with first amendment principles . . . Neither can a state university support a campus newspaper and then try to restrict arbitrarily what it may publish, even if only to require that material be submitted to a faculty board to determine whether it complies with "responsible freedom of the press". Id. at 896–897.

Antonelli v. Hammond, 308 F.Supp 1329 (Mass.1970), involved issues strikingly similar to the ones present in thi, case. Students at Fitchburg State College, a state-supported institution of high learning in Massachusetts, published, with University support, a campus newspaper, *The Cycle*. In that case, the student newspaper published a story, "Black Moochie", written by Eldridge Cleaver. The paper's usual printer, whose daughter was a student at the college, read the article prior to printing and objected strenuously to its content. He brought this matter to the attention of the President of the University who held up this issue of *The Cycle*. The primary reason for objection to the article given by the University was that it contained "obscene" language. In addition to preventing publication of this issue of *The Cycle,* the President of the University set up an advisory board which would have to give its prior approval to all articles and materials intended for publication in the newspaper.[6]

The court in *Antonelli* expressly considered the claim of the University that it had the power to censor because it

6. The only viable difference between the *Antonelli* case and the one at bar is related to this advisory board. We feel that difference is not relevant to the legal issues involved. One other factual difference which bears on the legal issue is that in *Antonelli* the article and issue of *The*

*Cycle* in dispute was, indeed, published by another printer at the expense of private individuals and then distributed on the campus. Here the restraints imposed by the University have continued to hold publication of this issue of *Images* in abeyance.

paid the funds for publication of *The Cycle*:

> We are well beyond the belief that any manner of state regulation is permissible simply because it involves an activity which is part of the university structure and is financed with funds controlled by the administration. The state is not necessarily the unrestrained master of what it creates and fosters. Thus in cases concerning school-supported publications or the use of school facilities, the courts have refused to recognize as permissible any regulations infringing free speech when not shown to be necessarily related to the maintenance of order and discipline within the educational process. See, e. g. Dickey v. Alabama State Board of Education, 1967, N.D. Ala., 273 F.Supp. 613; Snyder v. Board of Trustees of University of Illinois, 1968, N.D.Ill., 286 F.Supp. 927; Brooks v. Auburn University, 1969, N.D.Ala., 296 F.Supp. 188; Zucker v. Panitz, 1969, S.D.N.Y., 299 F.Supp. 102; Smith v. University of Tennessee, 1969, E.D.Tenn., 300 F.Supp. 777; Close v. Lederle, 1969, D.Mass., 303 F.Supp. 1109. Id. at 1337.

The principles enunciated in these two cases have been derived from a long line of legal opinions dealing with the struggle between college students and university administrators over matters involving freedom of speech and expression. The cases involving student publications are quite similar to, and owe much of their rationale to, those cases which have been characterized as "open forum" cases. This circuit has recognized the strong constitutional guarantees where an attempt was made by a university to prevent an invited speaker from giving an address by simply refusing to pay for his appearance. Brooks v. Auburn University, 5 Cir. 1969, 412 F.2d 1171.

The University has apparently conceded that the above rule is indeed the governing standard. The University, however, seeks to distinguish this literary publication, *Images,* from a campus newspaper or campus annual. The coun-sel for the University admitted at oral argument that it was the University's position that they could not censor either the campus newspaper, *The Daily Mississippian,* or the campus annual, *The Ole Miss.* In light of this frank admission, we are somewhat at a loss to see the distinction between the magazine *Images* and either of these publications. Both the newspaper and annual are paid for through University administered funds. In fact, it is our understanding that both these other publications, while paid for by students, are in reality financed by a non-waivable fee which is paid by every student as part of his regular tuition fees at the time of his enrollment for the current term. Both of those publications are clearly, on their face, identified with the University.

The University attempts a distinction by pointing out that here *Images* was to be published with the "advice" of the English department, although it does not show any evidence that the other publications are not similarly subject to "advice". They go so far as to suggest that this means it will be identified as speaking for the English department and thus the University. We do not feel this factor is very relevant. The advice contemplated was directed at helping the students in choosing material of literary merit for publication and, indeed, in this case the material objected to was approved by the English department's appointed adviser for the magazine, who testified in this case on behalf of the student editors, author and magazine. Thus, we see no difference between this and other University publications which the University concedes, quite correctly in our opinion, that it cannot censor except within constitutional limitations. The literary magazine, *Images,* is certainly within the broad class of publications to which the broad rule enunciated in *Antonelli* was designed to apply.

### Special Circumstances

Having disposed of any claim by the University that it has an arbitrary pow-

er because of its relationship with *Images* to censor its content, we now turn to the issue of whether the censorship imposed in this case was justified under the rationale of "special circumstances" permitting the state to circumscribe certain activity which would otherwise fall within the generally protected area. We are convinced that no such special circumstances exist in this case.

There has been no claim that publication of this magazine containing these short stories would or could lead to any significant disruption on the University campus. Basically, the special circumstances which the University seeks to have this court recognize consist of matters of taste and the right of the University to prevent activities which it would feel would lead to criticism of it from outside sources. There was also, at one time, a claim by the University that publishing these articles might subject it to state prosecution under the state obscenity laws.

The University apparently never attempted to show that the materials herein were legally obscene and it appears now that they have dropped this contention altogether on appeal. The court is satisfied that these stories as written do not meet the standard of legal obscenity. We do not, however, automatically say that the University is in all cases forbidden from interference in First Amendment cases unless it can show that a legal definition of obscenity is satisfied. We simply do not have to reach that issue in the disposition of this case. Assuming arguendo that the University does indeed have a power to impose some restrictions on language which does not measure up to legal obscenity, we do not feel that the language objected to in this case, used as it is, would give sufficient grounds for interference. This analysis will also be sufficient to dismiss the "taste" and "appropriateness" arguments of the University.

■ We have previously pointed out the nature of the words involved in these short stories and the manner in which they are used by the author. We feel that we are past the point in this country today where the mere use of any single word in a public arena can be immediately branded as so tasteless or inappropriate that its use is subject to unbridled censorship or restriction by government authority. The short stories involved in this case, as noted contain the word which has historically been viewed as the "worst" obscenity. With regard to this very four-letter word, the Supreme Court has stated that:

> While the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because government officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual. Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).

In that same opinion, the Court noted another factor which is relevant in this case. The Court refused to sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated.

\* \* \* \* \* \*

> Finally, and in the same vein, we cannot indulge in the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from running the risk of opening the door to such grave results. Id. at 26, 91 S.Ct. at 1788.

As we have previously noted in this opinion, much of the literary justifica-

tion for the use of these words in the short stories rests on the emotive feeling and mood they are designed to create. They bear both on the development of the central characters and also may be read to serve as part of the comment which this author intends to make to his reader through these stories.[7] Thus, we feel it would be extremely difficult to censor these words merely for their presence in the story because of their possible relation to the themes which the author strives to present.

Furthermore, we cannot help but take note that these words have been recognized as not that unusual when found in connection with college students and use on college campuses.[8] In fact, at the hearing below, one of the witnesses, a student at the University of Mississippi, stated that he had heard all of the words contained in these short stories spoken on campus by University of Mississippi students, and that, indeed, he believed he had heard them spoken by faculty members. The University also admits that commercial publications are sold on the University campus which contain these words and other words which it would classify as "distasteful". For instance, the evidence establishes that the maga-zine *Playboy* is sold on campus at various bookstore facilities. Furthermore, the University admits that the *Kudzu*, an "underground" newspaper which admittedly contains "ragged" language similar to that found objectionable in these stories, had been previously sold without interference on the University campus. The only attempted distinction by the University is that here they are more connected with this magazine since it is published by students and with the advice of the English department. As noted, we do not feel that that mere distinction waives all constitutional privileges of the students involved.

Finally, the court feels that it is extremely significant that the University admits that works in its library and, indeed, works that are assigned to students as required reading for courses contain the same words, used in much the same way, as are found in these stories to which the University now objects. It is also admitted that these same words objected to by the University here appear frequently in well-respected literature, especially that of the twentieth century. These words are often found in the works of such accepted literary figures as J. D. Salinger,[9]

---

7. Professor Harrington, author of one novel and several shorter works of fiction, testified as to literary merit and style at the hearing below.

8. We note that at least one Circuit Court of Appeals has suggested that one of the objectionable terms present in the stories, literally referring to an incestuous son but more commonly used as an abusive epithet, is not that unusual or condemnatory when it reaches the tender young ears of high school seniors. Judge Bailey Aldrich, writing for the First Circuit in Keefe v. Geanakos, 1969, 418 F.2d 359, addressed a situation involving the possible punishment of a high school teacher who read an article to a senior class which repeatedly used the epithet referred to above. In speaking directly to the school board's alleged fear of adverse parental reaction, the learned jurist stated:

> With regard to the word itself, we cannot think that it is unknown to many students in the last year of high school,

and we might well take judicial notice of its use by young radicals and protesters from coast to coast. No doubt its use genuinely offends the parents of some of the students—therein, in part, lay its relevancy to the article.

> Hence, the question in this case is whether a teacher may, for demonstrated educational purposes, quote a "dirty" word currently used in order to give special offense, or whether the shock is too great for high school seniors to stand. If the answer were that the students must be protected from such exposure, we would fear for their future. We do not question the good faith of the defendants in believing that some parents have been offended. With the greatest of respect to such parents, their sensibilities are not the full measure of what is proper education. [Footnotes omitted]. Id. at 361–362.

9. See, e. g., *The Catcher in the Rye*.

James Baldwin,[10] Norman Mailer,[11] Bernard Malamud,[12] and Truman Capote,[13] to name but a few. Similar language is also abundant in many recent best-sellers, including *Love Story, The Godfather, Portnoy's Complaint, The Adventurers,* and *Valley of the Dolls.* Even the works of William Faulkner, an author indelibly associated with Oxford and the University of Mississippi, contain a high number of "obscenities" much like the words under attack here. Thus, here the University is seeking to restrain the use of certain words which it acknowledges are often used in literary compositions and words which are found in the books it offers for student reading through its library.

Finally, we note that the testimony established that the University goes so far as to prescribe as required reading at least one work which includes most, if not all, of the words found in these short stories. It also contains the word to which the University, we would surmise, most strenuously objects. Professor Harrington testified that as part of his course in the twentieth century novel, he assigned as required reading the recognized literary masterpiece *Ulysses,* written by James Joyce. We note that once, years ago, that work was also subject to attempts at censorship by governmental authorities in this country. See *United States of America v. One Book Called "Ulysses",* 5 F.Supp. 182 (S.D.N. Y., 1933), aff'd. *United States v. One Book Entitled Ulysses by James Joyce,* 2 Cir. 1934, 72 F.2d 705. Anyone familiar with the soliloquy of Molly Bloom will recall that her statement includes many of the same words found objectionable here. Thus, students who take this course in modern novels are *required* to read at least one work which includes the same or very similar words to the ones here condemned. This, indeed, begins to become a strange double standard.

■ Since the University is relying primarily on a claim that these stories are too tasteless and inappropriate to be connected with the University, *merely* because of the words which appear in the stories, we find that justification particularly hard to accept as compelling because of the admitted facts we have set out above. There has been testimony by a literary expert that these stories have literary merit and that was also the collective judgment of the student editorial board. The University has not really attacked literary merit, but has instead focused its argument on the mere presence in the story of these words. Yet these words appear and are more or less forced upon any student who takes certain courses at the University. It does not seem necessary to get into a discussion of whether or not the stories of this author have as much literary merit as a novel by James Joyce. That is irrelevant to the consideration of the issue as it has been framed by the University itself. We do not see how the University can draw a line, based on the grounds it asserts, between these short stories, which are intended only for those persons, mostly students and under five hundred in number, who pay one dollar for the issue, and a novel which students are required to buy and read in order to receive course credit. While the anomaly present in this factual situation is not really necessary for the legal opinion we render in this case,[14] we think it should be pointed out

10. See, e. g., *Another Country.*

11. See, e. g., *Prisoner of Sex.*

12. See, e. g., *The Tenants.*

13. See, e. g., *In Cold Blood.*

14. Again we refer to the opinion of Judge Aldrich in Keefe v. Geanakos, supra, note 8, for in that case he was confronted with a situation where the high school library contained at least five separate works by five separate authors which contained the word used in class by the teacher under attack. We can only restate his salient comment:

> Such inconsistency on the part of the school has been regarded as fatal. [Citation omitted]. We, too, would probably so regard it. At the same time, we prefer not to place our decision on

because it illustrates the folly in making matters of free speech and word usage turn on a state's interpretation.[15] As far as the words are concerned, the words themselves, their mere presence can be no less offensive because they appear in a recognized literary triumph rather than in the first attempts by one who could be characterized a budding young author, out to "forge in the smithy of [his] soul the uncreated conscience of his] race".[16]

■ Finally, the University attempts to invoke the special consideration that publication of this story, as long as it acknowledged any recognized connection with the University of Mississippi, would endanger the current public confidence and good will which the University of Mississippi now enjoys. See Duke v. North Texas State University, 5 Cir. 1972, 469 F.2d 829. While we recognize that such considerations can go into the determination of whether a given interference with freedom of speech is justified, we feel it is also very clear that use of such a rationale should be handled gingerly and applied only in what can be characterized as most extreme cases.[17]

We do not read *Duke* as saying that a university has the right to restrict any activity involving free speech or expression merely because it might cause adverse reaction in the newspapers or because some segment of the state's population might be unhappy with the university's actions. *Duke* was itself a very close case, and we feel it should be read restrictively to apply only where the actions involved are quite extreme in light of the educational purposes of a university. We see no such factors here.

■ As a final word, we can only reiterate that speech cannot be stifled by the state merely because it would perhaps draw an adverse reaction from the majority of people, be they politicians or ordinary citizens, and newspapers. To come forth with such a rule would be to virtually read the First Amendment out of the Constitution and, thus, cost this nation one of its strongest tenets. It would be unthinkable to say that the University of Mississippi could censor and forbid publication of an article in its law school journal on the grounds that the article concerned some sensitive issue, such as forced busing or abortion, which, because of the resolution reached in the article, the University determined would create an overwhelmingly adverse reaction among members of the bar and the public. The First Amendment simply took the power to make such judgment out of the hands of the state.

■ The University alleges that it here is acting to preserve what it considers an acceptable level of decency in this publication. That statement, how-

this ground alone, lest our doing so diminish our principal holding, or lead to a bowdlerization of the school library. 418 F.2d at 362–363.

15. As to literary merit, Professor Harrington testified for plaintiffs that he 'felt the stories had literary merit. Chancellor Fortune did not address literary merit directly but did state that he felt any literary merit was offset by the use of the objectionable language.

16. See Joyce, James, *A Portrait of the Artist as a Young Man*, Viking Press, Ellmann ed., 1964, page 253.

17. For instance, we find the *Duke* case easily distinguishable. First, we were there dealing with somewhat different principles of law since it involved an employer-employee relationship. Furthermore, that case involved quite vitriolic and vulgar personal attacks on the administration of the university made by a teacher who had not yet achieved tenure. They were certainly not made in the relatively sterile context of a literary composition. The statements and the way they were presented were, in the opinion of the court, enough to cast considerable doubt on whether the person making those statements could effectively continue as an instructor, working with an administration she had so crudely attacked. Finally, the procedural devices present in the *Duke* case, at least as the procedures followed have been outlined to us, are significantly different from those in this case.

ever, illustrates the core issue of this problem—what level of "decency" and who should decide when it has been reached. As previously noted, the use of the language is, at the very least, arguably justified in a literary context. It is not used suggestively nor does it approach pandering. The words are not being forced on an unwilling audience through public display. There is no chance of violent disruption from their use. The nature of the language is no longer really that unusual in current literature, films, and conversation—especially among the young. The trend to its use, both in spoken and written arts, while not to be commended, certainly must be recognized. "An acceptable level of decency" is obviously not a static proposition nor one easily determined. One needs only look around to see that things considered horribly "indecent" a few years ago are quite commonplace today. It is for this reason that, where modes of expression are involved, the First Amendment casts a heavy burden on any governmental body which seeks to censor on the grounds of "public decency". As the Supreme Court stated in Cohen v. California, supra:

> Against this perception of the constitutional policies involved, we discern certain more particularized considerations that peculiarly call for reversal of this conviction. First the principle contended for by the State seems inherently boundless. How is one to distinguish this from any other offensive word? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. 403 U.S. 15 at 25, 91 S.Ct. 1780, at 1788.

Thus, we conclude here that the University has not shown sufficient special circumstances to justify the interference it is attempting to impose on the full exercise of First Amendment freedoms. As previously noted, we do not in this opinion mean to say that no language or conduct short of legal obscenity can be regulated by a college or university when a student literary publication is involved. We do not have to reach that issue here. We are satisfied that on the facts of this case the University has not demonstrated that the language used in parts of these stories is so unusual, so condemnatory, that the requisite special circumstances have been achieved.

In closing, we must take note of the historical role of the University in expressing opinions which may well not make favor with the majority of society and in serving in the vanguard in the fight for freedom of expression and opinion. As the United States Supreme Court has recently reaffirmed:

> The precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools". Shelton v. Tucker, 364 U.S. 479, 487 [81 S.Ct. 247, 5 L.Ed.2d 231] (1960). The college classroom with its surrounding environs is peculiarly the "market place of ideas" and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom. Keyishian v. Board of Regents, 385 U.S. 589, 603 [87 S.Ct. 675, 17 L.Ed.2d 629] (1967); Sweezy v. New Hampshire, 354 U.S. 234, 249–250 [77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311] (plurality opinion of Mr. Chief Justice Warren), 262 [77 S.Ct. 1217] (1957)
>
> (Mr. Justice Frankfurter's concurring opinion).
>
> Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266, 279 (1972).

Therefore, we feel it is incumbent on this court to deny the University the power to restrict what must be recognized as a legitimate manner of expres-

sion on the basis of the justifications it seeks to assert in this case.

From our careful consideration of this case, we note with some sadness an undercurrent which permeates this whole controversy. We see no real spirit of compromise or accommodation on the part of either side. Throughout the record in this case we sense an air of confrontation, derived both from the actions of the students and the administration. The students are accused of deliberately taunting the University, throwing down a gauntlet which they knew the University must accept. For its part, there are numerous allegations, generally admitted, that the University and its chosen committee repeatedly refused to hear the students or their advisers, and to consider their points of view. It would seem to this court that perhaps a greater spirit of accommodation could have avoided the necessity of a costly and time-consuming resort to the federal courts. Perhaps some mutual editing could have removed much of the offensiveness which the University objected to. Perhaps the well-known practice of initial letters followed by blanks or dashes could have conveyed the meaning without unduly upsetting the University officials or the author. Perhaps a stated disclaimer as to content on the part of the University would have been sufficient.[18] But from the record before us, neither side really made an attempt at compromise. This is an unfortunate situation, especially where the conflict is between a University and its students and between censorship and expression.

For the reasons stated in this opinion, we hold that the district court was correct in granting the order restraining the University from further interference with the printing of the Magazine *Images* and that order is hereby

Affirmed.

18. Under questioning at the hearing, Chancellor Fortune did testify that he felt such

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

a statement would not have been enough for the university.