519 F.2d 257
 Ed SCHIFF et al., Plaintiffs-Appellees,
v.
Kenneth R. WILLIAMS, individually and as former president of
Florida Atlantic University and Glenwood G.
Creech, as president of Florida Atlantic
University, et al.,
Defendants-Appellants.
 No. 74-2205.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 17, 1975.
 
 James T. Schoenbrod, Miami, Fla., Charles E. Miner, Jr., Gen. Counsel, John D. Carlson, State of Fla. Board of Education, Tallahassee, Fla., for defendants-appellants.
 John L. Parker, Jr., West Palm Beach, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before GOLDBERG, CLARK and GEE, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 Three students brought suit against the president of Florida Atlantic University alleging that he had dismissed them from their positions as editors of the school newspaper in violation of their First Amendment rights. The district court found in favor of the students, ordered them reinstated, and awarded them back pay, compensatory damages, and attorneys' fees. We affirm the decision insofar as it grants back pay and compensatory damages, but reverse the award of attorneys' fees.
 
 
 2
 The plaintiffs, Schiff, Littman and Vickers, were editors of the Atlantic Sun, the student newspaper of Florida Atlantic University. On April 27, 1973, the President of the University, Kenneth Williams, dismissed all three from their positions and began publishing the student newspaper using administrative personnel. He published his reasons for this action in a statement which read in pertinent part:
 
 
 3
 "I am today dismissing Mr. Ed Schiff as Editor of the Atlantic Sun and Mr. Tom Vickers and Ms. Carin Litman as Associate Editors. I take this action because I have become convinced that the level of editorial responsibility and competence has deteriorated to the extent that it reflects discredit and embarrassment upon the university. I am also convinced that the decreasing quality of the Atlantic Sun is irreversible under the present senior staff leadership.
 
 
 4
 "It is clear to me that the Editor does not respect, or is not able to interpret correctly, the guidelines[1] of the Board of Regents and the President. The Atlantic Sun currently reflects a standard of grammar, of spelling and of language expression unacceptable in any publication, certainly unacceptable and deplorable in a publication of an upper-level graduate university.
 
 
 5
 "The editorial policy of the Sun has increasingly emphasized villification and rumor mongering, instead of accurately reporting items likely to be of interest to the university community. Even articles on non-controversial issues such as enrollment trends recently have been incorrect and misleading. The editorials themselves have degenerated into immature and unsophisticated diatribes which reflect most negatively on the overall quality of our student body."
 
 
 6
 Under 42 U.S.C. §§ 1981, 1983, and 1985, the student editors sought injunctive and declaratory relief against Williams and his successor in office, Glenwood Creech, and requested general, special, and punitive damages and attorneys' fees for alleged violations of their rights. The court found that the protection of the First Amendment barred defendants' action, ordered plaintiffs reinstated, and enjoined the defendants from further control of the editorial content of the Atlantic Sun. The court also ordered that the students be awarded back pay; that nominal compensatory damages of one dollar be paid by Williams in his personal capacity to each plaintiff; and that the defendants in their official capacities pay the attorneys' fees incurred by plaintiffs in prosecuting the action.
 
 
 7
 Awaiting Supreme Court action on pending cases which could resolve controlling issues, we remanded the case for clarification, since neither the source of the back pay award nor the source and rationale for the award of attorneys' fees appeared clear here. The supplemental record now filed discloses that back pay awards are to come from an activity fund contributed by students which the trial judge ordered placed in an account to be held by an appropriate state agency. The attorneys' fees award against the defendants in their official capacities was made as an integral part of the equitable remedy of injunctive reinstatement. The court made no finding of bad faith or obstinate conduct by the defendants.
 
 
 8
 The defendants' basic assertion of error relates to the court's finding that the dismissal of the editors was an actionable violation of their constitutional rights. They contend the question is not whether Williams restricted the editors' First Amendment freedom by regulation of the content of the newspaper, but whether the restriction was legally justified. The defendants maintain that since the editors were state employees, their free speech could be restricted by their employers if this right was outweighed by a more significant governmental interest in this case, the university's interest in a publication which maintained high standards of grammar and literary value so as to project a proper view of the university and its student body. Defendants argue that the judge did not hear testimony on the significance of these nonconstitutional reasons for the students' dismissal (control of technical quality); wherefore he could not and did not balance them against the constitutional aspect of the dismissal (control of content).
 
 
 9
 The defendants' argument fails on two grounds. First, no evidence was presented on the university's nonconstitutional reasons except for the unsubstantiated reference to poor technical quality of the newspaper in the president's statement. In the absence of any evidence as to specific publications, it was not possible for the court to make a balancing type of evaluation.
 
 
 10
 Second, the right of free speech embodied in the publication of a college student newspaper cannot be controlled except under special circumstances. The cases relied on by the defendant all involve university employees performing tasks unrelated to the First Amendment, who, incidental to their employment, exercised their First Amendment freedoms to the displeasure of the university. By firing the student editors in this case, the administration was exercising direct control over the student newspaper. See generally Healy v. James, 408 U.S. 169, 183, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972). The dispositive case in this circuit in the area of control of content of student publications is Bazaar v. Fortune, 476 F.2d 570, rehearing en banc 489 F.2d 225 (5th Cir. 1973). The rule of Bazaar is that special circumstances must be present to give a university the right to control student publications, for " . . . once a University recognizes a student activity which has elements of free expression, it can act to censor that expression only if it acts consistent with First Amendment constitutional guarantees. . . . (T)he courts have refused to recognize as permissible any regulations infringing free speech when not shown to be necessarily related to the maintenance of order and discipline within the educational process." 476 F.2d at 574-75. See Antonelli v. Hammond,308 F.Supp. 1329 (Mass.1970). In the case at bar the "special circumstances" relied on by the university poor grammar, spelling and language expression could embarrass, and perhaps bring some element of disrepute to the school; but, assuming the president's assessment was correct, these faults are clearly not the sort which could lead to significant disruption on the university campus or within its educational processes. See Bazaar v. Fortune,supra at 576. See also Papish v. Board of Curators of the University of Missouri, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973).
 
 
 11
 The defendants also contest the award of compensatory damages by asserting that these public officials are immune from liability because they were performing discretionary duties and acted in good faith. The district court acknowledged that the president was not "motivated by malice . . . perhaps he thought he had a right to do what he did; he probably did think so." Nevertheless he found that President Williams did not seek legal advice prior to his actions and that the sort of motivation for his actions which the proof established did not constitute a defense to a charge that his acts had abridged First Amendment rights.
 
 
 12
 Recent precedent has broadened the qualified immunity available to public officials who are accused of constitutional wrongs while exercising discretionary duties within the scope of their authority. "These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation (is) dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords basis for qualified immunity . . .." Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974). "To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school (official), who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic unquestioned constitutional rights of his charges. Such a standard neither imposes an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system." (Emphasis added.) Wood v. Strickland, --- U.S. ---, 95 S.Ct. 992, 1000-01, 42 L.Ed.2d 214 (1975). The district court's finding that good faith immunity was not available was based on a proper concept of the character and scope of this defense. President Williams cannot avoid responsibility for his abridgment of First Amendment rights because his motives were to serve the best interest of the school.
 
 
 13
 The defendants urge that the back pay and attorneys' fees award expend themselves upon the treasury of Florida, and that under Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Eleventh Amendment bars federal jurisdiction over an action to recover a compensatory award which must inevitably come from general revenues of a state.
 
 
 14
 Insofar as the instant decree required past earnings be repaid to plaintiffs, Edelman's teaching applies full force. If this facet of the judgment had expended itself upon the state treasury, it could not stand.
 
 
 15
 Attorneys' fees, however, present a different question. Edelman recognizes that a very dim line divides prospective relief incident to a federal court's equitable power under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which may be costly to the state but is permissible under the Amendment, from a compensatory or retroactive money judgment to which the judicial power of the United States does not extend. Cases testing awards of attorneys' fees in such situations are now pending on the Supreme Court's docket. We initially thought that the pendency of these cases required the withholding of our decision. After the district court's clarification, it now appears that both the back pay and attorneys' fees questions in the present litigation can be answered without raising the Eleventh Amendment issues which are awaiting resolution.
 
 
 16
 The supplemental record discloses that the back pay award was to come from a fund composed of payments by students of the university as part of their activity fee. The private monies in this fund were intended to be used for operating expenses of the paper, which included the salaries of Atlantic Sun personnel. The fund was not the property of the State of Florida. It had been entrusted to a state agency only to hold and invest pending the outcome of this appeal. Under these circumstances the judgment term requiring that monies from this fund be used to repay lost wages had no true impact on the state treasury; the effect of paying over such trust funds for their intended purpose would be an ancillary one at best. Such payments are not prohibited by the Eleventh Amendment. Hander v. San Jacinto Junior College, 519 F.2d 273 (5th Cir. 1975).[2]
 
 
 17
 An intervening decision of the Supreme Court on a completely different ground has now effectively foreclosed the award of attorneys' fees to plaintiffs in this action. In Alyeska Pipeline Service Co. v. The Wilderness Society, --- U.S. ---, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Court explicated the legal history of the "American rule" on awards of attorneys' fees each party must bear the cost of its own attorneys' fees and the traditional exceptions to that rule 1) a contract between the parties; 2) a specific statute; 3) the common fund theory; or 4) cases involving willful disobedience of a court order or instances of bad faith, vexatious, wanton, or oppressive conduct. 95 S.Ct. at 1621-23. Alyeska has now made it plain that it was improper for the district court to make an award of attorneys' fees because the first three exceptions were not present and the award made was not based upon any conduct by the defendants which could qualify under the "bad faith" exception. The trial court stated that the award was bottomed upon the exercise of its chancery powers in the particular circumstances of the case. This statement does not constitute a basis which can bring the court's action within any traditional exception permitted by Alyeska. It therefore must be vacated. See Pupa v. Thompson, 517 F.2d 693 (5th Cir. 1975). The awards of nominal compensatory damages and back pay are affirmed. The award of attorneys' fees is reversed.
 
 
 18
 Affirmed in part and reversed in part.
 
 GEE, Circuit Judge (specially concurring):
 
 19
 While in agreement with the result and with much the majority has said, I am unable to muster such confidence as it avows (supra, at 261) in the district court's "proper concept of the character and scope" of the good faith defense. The question of whether a public official knew his official actions violated a person's constitutional rights or, alternatively, should have known it is not always easily answered. In very recent opinions treating of the defense, for example, the Supreme Court has repeatedly cautioned that "an official has, of course, no duty to anticipate unforeseeable constitutional developments." O'Connor v. Donaldson, --- U.S. ---, ---, 95 S.Ct. 2486, 2494-95, 45 L.Ed.2d 396, 408 (1975), citing Wood v. Strickland, 420 U.S. at ---, 95 S.Ct. at 1004, 43 L.Ed.2d at 225 (1975). Nor is it certain in every case what facts constitute reasonable grounds on which to found good faith belief. Indeed, in our circuit at any rate, it presently appears that a sheriff charged in a § 1983 false imprisonment suit cannot invoke the good faith defense at all. I do not think that holding correct, and my views there expressed prevent my speaking with as much certainty about the good faith defense as does the majority. See Bryan v. Jones, 519 F.2d 44 (5th Cir. 1975), dissenting opinion. But it seems to me that in this case, despite trial-court findings of a want of malice and of probable good faith belief by President Williams in the propriety of his actions, it appears clear that he should have known better and would have had he sought legal advice. After all, our panel's opinion in Bazaar v. Fortune, 476 F.2d 570 (5th Cir. 1973)[1] had come down two months before, and its view of the law was scarcely unprecedented.
 
 
 
 [1]
 The guidelines attached to the statement provide in part:
 a. . . . (W)e want only a newspaper which serves its public the University family in the tradition of all great newspapers. So long as it does this it will have our support and it will have earned the freedom it must have.
 b. What is it not?
 It is not a gripe sheet;
 It is not a smear sheet;
 It is not representative of shoddy, 'yellow journalism'; or of pornography; or of innuendo; or of invective;
 It is not a platform to serve special interests of the administration, or of the faculty, or of any student clique.
 c. Primarily 'of, for and by' the students, it must serve the entire University family.
 d. It must accept responsibility for writing the truth and for presenting all sides of issues.
 e. It must reflect the best interests of the University community it serves.
 f. Low and vulgar language or art is prohibited.
 
 
 [2]
 Sections 18.101, 239.01(6), 240.095 and 240.0951, Florida Statutes Annotated indicate that this fund is at all times treated distinctly from state funds. The fund is expressly excepted from the general requirements that all state funds be deposited in the state treasury. Expenditures are limited only to those benefiting the student body. Such expenditures are determined by each respective student government association subject to veto by the university president. University presidents may reallocate funds, but only for health service, intercollegiate athletics, or current bond obligations. Unexpended and undispersed funds do not revert to the state treasury, but are carried over to the next fiscal year's student activities fund. As Edelman teaches, the Eleventh Amendment bars federal jurisdiction to make awards when "(t)he funds to satisfy the award . . . must inevitably come from the general revenues of the State." 415 U.S. at 665, 94 S.Ct. at 1357
 
 
 [1]
 Modified 489 F.2d 225 (5th Cir. 1973) (en banc)