04-5250-cv
Husain v. Springer

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: February 14, 2007                    Decided: July 13, 2007)

Docket No. 04-5250-cv

_____

SARAH HUSAIN, WILLIAM WHARTON, DEVON BLINTH, COLLEEN MCGRAHAM, JEFF MCGRAHAM, KATHLEEN MCHUGH, MARC J. PESEAU, NEIL SCHULDINER, AND KASADORE RAMKISSON,

*Plaintiffs-Appellants*,

MANJULA WIJERAMA, MORGAN HEALY, DIANE ISSAC, JAMES MURPHY, MICHAEL J. PERRINE, JOANNE GALLO, DESMOND FIGUEROA, AND JOHN PAE,

*Plaintiffs*,

IMAN EL-SAYED AND RENEE MARHONG,

*Intervenors-Plaintiffs-Appellants*,

v.

MARLENE SPRINGER, CAROL JACKSON, MICHAEL SILVA, WINSOME ALSTON, SIBI GEEVARGHESE, JOSEPH CANALE, JUERGEN SCHNETZER, ANDRE WOODS, CHARLO ALMEDA, CHRISTOPHER ALVAREZ, KELLYANNE BIESTY, MARY ANNE CHRISTENSEN, LUIS CRUZATTE, W. ANN REYNOLDS, ROBERT E. DIAZ, ROY MOSKOWITZ, MICHAEL SOLOMON, CITY UNIVERSITY OF NEW YORK, COLLEGE OF STATEN ISLAND, STUDENT ELECTION REVIEW COMMITTEE OF THE COLLEGE OF STATEN ISLAND, BOARD OF TRUSTEES OF THE CITY UNIVERSITY OF NEW YORK, MARLA BRINSON, MATTHEW GOLDSTEIN, AND KATHLEEN GALVEZ,

*Defendants-Appellees*,

WASHINGTON HERNANDEZ AND TINA JEFFERSON,

*Defendants.*

_____

Before: JACOBS, *Chief Judge*, WALKER and CALABRESI, *Circuit Judges*.

_____

Chief Judge Jacobs concurs and dissents in part in a separate opinion.

Appeal from judgments of the United States District Court for the Eastern District of New York (Gershon, J.) dismissing certain defendants and granting the remaining defendant summary judgment.

Affirmed in part, vacated and remanded in part.

_____

RONALD B. MCGUIRE, New York, NY, *for Plaintiffs-Appellants* and *Intervenors-Plaintiffs-Appellants*.

MARION R. BUCHBINDER, Assistant Solicitor General (Michael S. Belohlavek, Senior Counsel, of counsel), *for* Eliot Spitzer, Attorney General of the State of New York, *for Defendants-Appellees* Marlene Springer, Carol Jackson, Michael Silva, Winsome Alston, Sibi Geevarghese, W. Ann Reynolds, Robert E. Diaz, Roy Moskowitz, Michael Solomon, City University of New York, College of Staten Island, Student Election Review Committee of the College of Staten Island, Board of Trustees of the City University of New York, Marla Brinson, Matthew Goldstein, and Kathleen Galvez.

Joseph P. Esposito, Nicolas Jafarieh, Jonah E. McCarthy, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC; Rex Heinke, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA; S. Mark Goodman, Michael C. Hiestand, *of counsel*, Student Press Law Center, Arlington, VA, *for Amicus Curiae* Student Press Law Center.

_____

CALABRESI, *Circuit Judge*:

In this appeal, we consider whether a public college president's decision to cancel a student government election because of content published in a school newspaper violates the First Amendment rights of the student journalists who produce that publication. We conclude that, in the circumstances presented in this case, the school administrator's actions did violate the First Amendment. Because factual issues exist with respect to the question of whether the college president is entitled to qualified immunity, we hold that it was inappropriate for the district court to grant summary judgment to the defendants. Accordingly, we vacate the district court's judgment with respect to the college president and remand the case for further proceedings.

## BACKGROUND

### I. Events Giving Rise to the Lawsuit

*A. The School*

The school newspaper at issue was produced by students at the College of Staten Island ("CSI" or the "College"), which is part of the City University of New York ("CUNY") system. Under state law, the CUNY Board of Trustees (the "CUNY Board") may impose mandatory student activity fees to support student activities and regulate the expenditure of those funds. At all times relevant to this lawsuit, CSI students, as a condition for registering for classes, were required to pay mandatory student activity fees in an amount set by the CUNY Board. At CSI, a portion of the student activity fees is earmarked for a general fund to be allocated by the CSI student government to several extracurricular activities, including student publications.

The CUNY Board of Trustees Bylaws ("CUNY Bylaws") mandate that CSI establish a Student Elections Review Committee ("SERC"), which, among other responsibilities, approves election procedures and certifies election results. CUNY Bylaw § 15.2[d]. During a student government election, the SERC meets when needed to consider alleged violations of election rules and other complaints regarding the election process. The student government nominates individuals, who may be students, faculty, or administrative staff, to serve on the SERC. From those nominees, the CSI president appoints the members of the SERC. The intent of Bylaw § 15.2[d] is to limit the role of college presidents to "receiving appeals from the Student Elections Review Committee where an individual student has received a negative determination on a request." On appeal, the CSI president may uphold, reverse, or modify the SERC's determination.

Each spring, CSI holds annual elections for the Student Senate, as well as for other student government positions. Once elected, the CSI Student Senate in turn names a president and eight commissioners from among its members. One of the commissioners chairs a "Committee on Publications" that is responsible for regulating student media outlets. In the 1996-1997 academic year, the allocation of student activity fees to student publications was made by the Student Senate based on the recommendation of the Committee on Publications.

*B. Publications Funded by Student Activity Fees at CSI*

CSI allocates student activity fees to fund a number of student publications, including the one at issue in this litigation, the *College Voice*. The *College Voice* is a student newspaper and

-4-

political journal that is primarily paid for from student activity fees.[1]  The *College Voice* publishes articles and editorials on a wide range of topics, including pieces on CSI, CUNY, local, national, and international affairs, reviews, and poetry.  The editors of the *College Voice* choose the material that the newspaper publishes without any supervision or prior review by anyone other than the editors and staff of the newspaper.  (The newspaper has a faculty advisor who does not review or approve articles prior to publication.)  Participation in the *College Voice* is entirely extracurricular, and the editors and staff do not receive any academic credit for working on the newspaper.

In addition to the *College Voice*, CSI also funds a college radio station and other student media outlets using the student activity fees.  The other outlets include the *Banner*, which the student government designated the official campus newspaper, a literary magazine named *The Third Rail*, and various other publications.  CUNY and CSI have not placed any restrictions on the subjects that may be covered in the *College Voice* or the *Banner*.[2]  These newspapers are not

---

[1] The May 1997 issue of the *College Voice*, which is at the heart of this litigation, was funded entirely by student activity fees.

[2] In 1995, CUNY Vice Chancellor for Legal Affairs Robert Diaz sent the CUNY Council of Presidents a memorandum entitled, "Regulation of Speech by an Institution of Higher Education."  That memorandum stated, in part:

> The First Amendment protection of freedom of speech and of the press apply to student newspapers and other publications.  Therefore, a public university may not impose any content-based prohibition on such publications except to serve a "compelling state interest" . . . .  Similarly, a public university may not take adverse action against a student newspaper . . . or against a particular student because it disagrees with the content of a student newspaper.  While a college may not interfere with the content of student publications, it may, consistent with the law described earlier, promulgate time, place and manner restrictions regarding the distribution of student publications.
>
> . . .

prohibited from publishing articles or editorials expressing opinions or endorsing candidates in student elections. There is no rule or regulation prohibiting or restricting the editors or staff members of the *College Voice*, or other publications, from running for student government positions or from endorsing themselves.

According to the plaintiffs' complaint, in the early 1990s the *College Voice* was designated the official college newspaper of CSI. Several years before the Spring 1997 election, the editors of the *College Voice* began publishing articles that reflected a generally "left-wing" perspective on campus, local, national, and international political issues. Many of the articles and editorials were critical of CUNY and CSI administration officials. These positions prompted some students, who disagreed with the *College Voice*'s editorial policy, to form a second student newspaper at CSI called the *Banner*. The CSI Student Government subsequently revoked *College Voice*'s designation as the "official" CSI student newspaper and gave that status to the *Banner*. In Spring 1997, the *Banner* was the official CSI student newspaper.

*C. The Spring 1997 Election*

i. The Student Union Slate

> While college or university property may not fall into the "quintessential" public forum category, the Supreme Court has held that property that the government has made available for expressive activity by the public also constitutes a public forum. . . . This category (often called a "limited public forum") has been broadened to include not just physical sites but "channels of communication opened for public speech." . . . Once a public institution creates such a public forum, even if it was not required to create it in the first place, the institution cannot regulate expressive activity in that forum based on its content.

(internal citations omitted). In another case involving a student publication at CUNY, this court found that, in this memorandum, CUNY "expressly disclaim[ed] any right of the institution to control student publications, such as those financed through student activity fees." *Leeds v. Meltz*, 85 F.3d 51, 54 (2d Cir. 1996).

-6-

In the Fall 1996 term, some CSI students concerned about various student life issues at CSI and CUNY began meeting and formed an organization they called the "Student Union." During the student government elections in the Spring 1997 semester, the Student Union ran a slate of candidates for a total of 37 positions in the Student Senate and other governing organizations. Several editors and staff members of the *College Voice*, including some of the plaintiffs, were among the candidates running on the Student Union slate. The only opposing slate was "Students for Students" ("SFS"), which was composed mainly of incumbent members of the Student Senate seeking re-election. Almost all of the candidates in the Spring 1997 election were affiliated with either the Student Union or SFS slates.

The Spring 1997 student government election at CSI was scheduled to take place between April 30 and May 3, 1997. Before the election, CSI's SERC approved eight election rules. Two of those rules are at issue in this litigation. Rule 2 provided: "The campus newspaper may not be used as posters on walls, bulletin boards, etc. and may not be used as a means to distribute campaign flyers." Rule 5 stated: "The Student Government will be glad to make you 30 copies of your stamped and approved poster or flyer. All candidates must remove their election materials from the designated areas after the election is over."

ii. May 1997 Issue of the *College Voice*

Prior to the Spring 1997 election, the *College Voice* decided to endorse the Student Union slate.[3] By agreement within the *College Voice* editorial board, the decision about whether or not

---

[3] Previous issues of the *College Voice* had contained editorials and articles supporting the demands of the Student Union and encouraging students to join the new organization, as well as articles critical of the incumbent student government.

to endorse candidates, which candidates to endorse if the newspaper decided to do so, and what content to run in the issue was to be made by the members of the board that were not candidates in the Spring 1997 election. The *College Voice* chose to publish a special election issue that the editors intended to have distributed on April 28, 1997, two days before the beginning of the voting period.[4] The timing was a significant aspect of the *College Voice*'s message. An editor of the *College Voice* explained, "an important part [of publication] is not just the content of the newspaper, but timing and placement. And we felt that the timing a few days before the election would be the most opportune time to influence the election."

The May 1997 issue of the *College Voice* consisted of twenty-eight pages. The front page displayed a group photograph of twelve of the candidates running on the Student Union slate under a bold headline, "VOTE STUDENT UNION!" The rear cover of the newspaper featured only the Student Union's twelve-point platform. Page two of the issue contained an editorial entitled "Vote Student Union." Various candidates' platform statements were printed on pages six and seven. The issue also included two articles by two of the plaintiffs criticizing the incumbent members of the student government who were running on the SFS slate, and two articles, one by a plaintiff and the other by a non-plaintiff, criticizing the CUNY chancellor. The remainder of the issue was devoted to articles on a wide variety of other matters, including pieces on international affairs, a New York City mayoral candidate forum, a work requirement for students receiving public assistance, campus security, the history of CUNY, the CUNY faculty union, and tenants' rights. It also included music reviews and poetry.

---

[4] Although the issue was scheduled to be distributed on campus on April 28, the date on the edition was "May 1997."

The *Banner* also published an election issue prior to the May 1997 election that included platform statements from candidates running on both the Student Union and the SFS slates.

iii. The Actions of the Student Government and CSI Administration

On April 28, 1997, the editors of the *College Voice* were informed by a representative at their printer that, although the issue had been printed and was ready for delivery, Student Government Publications Commissioner Juergen Schnetzer had directed the printer not to release the issue. Schnetzer was running for re-election on the SFS slate. On April 29, the attorney for the *College Voice* editors faxed a letter to CSI President Marlene Springer informing her that student government officials had directed the printer to impound the issue and requesting that she order the immediate release of the newspaper. The letter was copied to various other individuals, including CSI Vice President for Student Affairs Vicki Jackson and Student Government President Joseph Canale. President Springer consulted with Vice President Jackson and directed Jackson to ensure that the newspaper be released from the printer. Jackson spoke with both Canale and Schnetzer, but Schnetzer refused to rescind his order impounding the issue. Later that day (April 29), the Student Senate met in closed session to consider the administration's request to override Schnetzer's decision. The Student Senate refused to overrule the impound order.

Immediately following the Student Senate meeting, Vice President Jackson informed Canale that President Springer was overriding the Student Senate's decision and that the newspaper would be delivered to the CSI campus. Jackson directed college employees to

retrieve the newspapers from the printer and bring them to campus, which they did later that afternoon.

After the *College Voice* was delivered to campus, Andre Woods, an incumbent member of the Student Senate running for re-election on the SFS slate, filed a complaint with the SERC. His complaint alleged that the May 1997 issue of the *College Voice* violated Election Rule 2, which provided that "[t]he campus newspaper may not be used as posters on walls, bulletin boards, etc. and may not be used as a means to distribute campaign flyers." Woods requested that "any candidate found in that aforementioned issue of the *College Voice* by any means such as a Platform Statement or otherwise be disqualified from the ongoing elections."

The SERC considered Woods's complaint regarding the alleged Rule 2 violations at a meeting on April 30, 1997, and declined to sustain it. But the SERC passed a resolution declaring that "[t]he *College Voice* used student activity fee funds allocated to promote the election of particular candidates affiliated with the *College Voice*" and adjourned until the next day to consider further action on the complaint. On May 1, the SERC met again and passed a motion "to postpone the election and to consider those ballots cast null and void as it is the committee's decision that the electoral process had been compromised beyond its ability to be fair to all candidates." The polls were closed for approximately two-and-a-half hours until President Springer ordered that they be reopened (after receiving a faxed appeal from plaintiffs' attorney and hearing protests from students who arrived at her office). She declared that she would rule on all election appeals after the election had concluded on May 3. President Springer directed Vice President Jackson to preserve the election results in case she reversed the SERC's determination on appeal.

-10-

Springer set a deadline of May 5, 1997 for students to submit appeals from the SERC determination.  Her office received a number of submissions from students, including an appeal from the plaintiffs' lawyer and letters from other students in support of and in opposition to the SERC's determination.

iv. President Springer's Nullification of the Election

On May 6, 1997, President Springer issued a memorandum announcing her decision to affirm the SERC's nullification of the election because of the contents of the May 1997 issue of the *College Voice*.  The memorandum stated in relevant part:

> The *College Voice* inappropriately used student activity fee funds to publish and distribute approximately five thousand copies of a twenty-eight page issue of the *College Voice* with a cover boldly encouraging a vote for a particular slate of candidates, some of whom are also staff members of the *College Voice*. Moreover, much of the issue was substantially devoted to supporting the endorsed slate of candidates.  I find that this issue amounted to a thinly veiled student activity fee funded piece of campaign literature for the Student Union slate.  As a result, the electoral process was compromised beyond its ability to be fair to all candidates, as argued by other candidates who requested nullification of the election.
>
> The April 30th to May 3rd election is therefore declared null and void, and a new election scheduled for the period Thursday May 8th, 1997 through Friday, May 16, 1997.

President Springer testified that, in making her decision, the only election rules adopted by the SERC that she relied on were Rules 2 and 5.  The defendants, however, agree that candidates and slates were allowed, at their own expense, to post and distribute additional materials beyond the thirty posters or flyers paid for by the student government.  They further concede that, during the Spring 1997 campaign, both slates and some individual candidates

-11-

printed their own literature and that this was not a violation of Rule 5. They also agree that Rule 5 was not a restriction on the content of newspapers.

President Springer further testified that, in making her decision, she also relied on a non-election rule. This rule, although not part of the eight rules expressly adopted by the SERC prior to the election, was printed on the nomination form for candidates in the Spring 1997 student elections. It stated:

> All candidates are **REQUIRED** to submit platform statements for **each seat they are running for**. Platform statements should be no less than 50 words and no more than 100 words per statement. Statements will be published in the campus newspaper. Statements must be typed or submitted on disk and will not be edited, so be sure you represent yourself clearly and concisely. Deadline for submission of statements is April 21, 1997.
>
> I am aware of the guidelines regarding platform statements and am aware that failure to submit statements for each seat for which I am running for will result in my disqualification as a candidate.

The rule's reference to the publication of candidate platform statements applied only to the *Banner*, as the official campus newspaper, and not to the *College Voice* or other CSI student publications. The student government regularly submitted candidate platform statements to the *Banner* but did not submit the statements to the *College Voice*. This practice continued during the Spring 1997 election campaign, in the course of which the student government submitted the candidates' statements to the *Banner*. The *Banner* published the statements in its May 1, 1997 edition.

The day after President Springer nullified the election, the votes that had been cast were counted. The Student Union had won all thirty-seven positions for which the slate ran

candidates. The Student Union candidates also won all thirty-seven positions for which they ran in the second election that was held from May 8 to May 16, 1997.

v. The Effect of President Springer's Actions on *College Voice* Practices

After President Springer's decision, the members of the *College Voice* considered removing every copy of the May 1997 issue from campus before the second election in order to avoid angering the administration. In elections held in subsequent years, the *College Voice* reduced its coverage of the elections because, as an editorial board member explained, it "recognize[d] that our endorsement could be a 'kiss of death' for candidates we support because if President Springer or the [SERC] disapprove of our election coverage, they may cancel the election or take some other action, such as disqualifying a candidate or a slate who we prominently endorse, or prohibiting the publication or funding of our newspaper." Indeed, in Spring 1998, candidates from the Progressive Student Alliance ("PSA"), many of whom were members of the *College Voice* or worked with the *College Voice* on common political goals, expressed concern about the *College Voice* endorsing them because of the candidates' fear that an endorsement could lead the administration to cancel once again the election or disqualify PSA candidates. In order to prevent that outcome, the *College Voice* editors decided to give their endorsement of the PSA less prominence than the newspaper's endorsement of the Student Union slate had received in Spring 1997.

**II. The Litigation Below**

-13-

In their amended complaint, plaintiffs[5] sought relief, pursuant to § 1983, for violations of their rights under the First and Fourteenth Amendments.[6] The plaintiffs alleged, *inter alia*, that the defendants' actions represented an imposition of viewpoint-based restrictions on the publication of a student newspaper, thereby depriving the *College Voice* editors and staff of their First Amendment right to be free from such restrictions in the state-created public forum. The parties named as defendants in the action were: President Springer; various CSI employees; various CUNY employees; CUNY and its Board of Trustees; CSI; and CSI's SERC (the "CUNY Defendants"). CSI students who served on the student government during the 1996-1997 academic year were also named as defendants (the "Student Government Defendants"). Plaintiffs sought declaratory judgment, injunctive relief, nominal compensatory damages of $1.00 from each of the defendants, and punitive damages of $1.00 from each of the Student Government Defendants and $20,000 from each of the CUNY Defendants.[7]

*A. Preliminary Injunction Proceedings*

---

[5] The plaintiffs included members of the editorial board of the *College Voice* who were also candidates on the Student Union slate in the Spring 1997 election (Sarah Husain, William Wharton, and Neil Schuldiner), members of the editorial board of the *College Voice* who were not candidates in the Spring 1997 election (Manjula Wijerama and Kasadore Ramkisson), contributors to the *College Voice* who were candidates on the Student Union slate in the Spring 1997 election (Devon Blinth and Kathleen McHugh), candidates on the Student Union slate who were not editorial board members of, staffers of, or contributors to the *College Voice* (Colleen McGraham and Jeff McGraham), and a student unaffiliated with the *College Voice* who voted in the Spring 1997 election but did not run for office (Marc Peseau).

[6] They also sought relief for violations of the New York State Open Meeting Laws. That claim is not pursued on appeal.

[7] The district court subsequently approved a stipulation limiting any award for punitive damages to $1.00 per CUNY Defendant and permitting plaintiffs to seek compensatory damages from the CUNY Defendants up to an aggregate of $500.00.

The plaintiffs filed a motion for a preliminary injunction to prevent the CUNY Defendants from prohibiting plaintiffs from publishing endorsements of candidates in future student government elections at CSI or any other CUNY college and from taking reprisals against plaintiffs, including cancellation of any election results, for publishing such endorsements. During a hearing held before a magistrate judge on the motion, CUNY Associate General Counsel Michael Solomon confirmed that it was likely CSI would once again cancel student government elections if the *College Voice* published an edition similar to its May 1997 issue. Solomon told the magistrate judge, "I think if this happened again in spring 2000, the April 2000 elections and this identical issue came out, something [looking] like this and a student appealed, I think the Court should have a reasonable expectation the same thing would happen. The election results would be voided." Solomon also informed the magistrate judge that one way the *College Voice* could avoid these sanctions would be to submit its content to the SERC for pre-publication review. In light of these comments, the magistrate judge recommended that the district court grant the preliminary injunction.

After the magistrate judge issued her recommendation, defendants informed the district court that Election Rule 2 – which, as amended, provided that "Publications funded by Student Activity Fee cannot be used as campaign flyers or posters during the student elections and cannot be used as a means to distribute campaign flyers or posters" – had been repealed and that CSI would not reinstate the rule during President Springer's administration. Defendants further represented to the district court that they would not cancel any election in response to endorsements or opinions on elections published in school newspapers during Springer's

-15-

administration. Accordingly, the district court denied plaintiff's motion for a preliminary injunction.

*B. The District Court's Decision on the Merits*

In various early proceedings, the district court dismissed all of the defendants but CSI President Springer, CSI Vice President Jackson, and a former administrative employee, Michael Silva.[8] In particular, it dismissed the Student Government Defendants on the ground that they were not state actors. It also found that plaintiffs' claims for injunctive and declaratory relief were moot. Following discovery, plaintiffs moved for summary judgment against defendant Springer on the First Amendment claim. Defendants also moved for summary judgment on the grounds that (1) there was no First Amendment violation and (2) if there were, they were entitled to qualified immunity.

Ruling on the summary judgment motions, the district court held that the cancellation of the election violated the First Amendment rights of the defendants. In doing so, it rejected defendants' argument that Election Rules 2 and 5 justified President Springer's actions. It also found no merit in defendants' contention that the plaintiffs suffered no First Amendment injury because the cancellation of the election, as opposed to a denial of funding or an impoundment of the paper, did not prevent the dissemination of the *College Voice*'s views. Judge Gershon explained that "[i]t cannot be that University action taken as a direct result of the views printed in a student newspaper can escape First Amendment scrutiny simply because that action was directed toward the nullification of the goal that the students espoused rather than at the vehicle,

---

[8] Another administrative employee was dismissed pursuant to a stipulation by the parties.

-16-

the newspaper, in which that goal was promoted. The chill on expressive freedom is the same." Judge Gershon noted that chill was reflected in the *College Voice*'s coverage of subsequent student elections, and that such a chill amounted to a First Amendment violation.

Despite the district court's conclusion that Springer violated plaintiffs' First Amendment rights, the district court granted the defendants' summary judgment motion. It found that defendants Jackson and Silva could not held liable under § 1983 for this violation because Springer's conduct broke the causal connection between their actions and the harm to the plaintiffs.[9] And, it concluded that Springer was entitled to qualified immunity because it was not clearly established in May 1997 that her actions violated the First Amendment rights of the plaintiffs.

Plaintiffs appealed. In their action before this court, they contend that the district court erred when it held that President Springer was entitled to qualified immunity and when it dismissed the Student Government Defendants on the ground they were not state actors.[10]

## DISCUSSION

---

[9] The district court's finding as to Jackson was not appealed. Plaintiffs' challenge to the finding with respect to Silva was waived. *See infra* note 10.

[10] In their statement of questions presented and in the conclusion of their opening brief, plaintiffs assert they are also challenging the district court's holding that their requests for injunctive and declaratory relief are moot. But, in the text of the opening brief, plaintiffs make no arguments in support of this claim, nor do they do so in the reply brief. Similarly, at the end of their opening brief, the plaintiffs request their claims be reinstated against various defendants other than Springer, including Silva, but they do not discuss the issues relating to this ground for relief in the body of their briefs. Accordingly, we conclude that these claim are waived. *See Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). Plaintiffs expressly state that they do not appeal the dismissal of claims against Jackson.

**I. President Springer Violated Plaintiffs' First Amendment Rights**

*A. Scope of First Amendment Rights for Student Media Outlets, and the Student Journalists who Produce Them, at Public Universities*

Courts have long recognized that student media outlets at public universities, and the student journalists who produce those outlets, are entitled to strong First Amendment protection. These rights stem from courts' recognition that such student media outlets generally operate as "limited public fora," within which schools may not disfavor speech on the basis of viewpoint.

A limited public forum is "is created when the State 'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.' . . . In limited public fora, the government may make reasonable, viewpoint-neutral rules governing the content of speech allowed." *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005) (emphasis and internal citations omitted). Once the state has created a limited public forum, however, it must respect the boundaries that it has set. It may not "exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal citations and quotation marks omitted). The forum itself can take many forms, yet the analysis of the constitutionality of restrictions imposed on speech made in the forum remains the same. *See id.* at 830 ("The [student activity fund] is a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable.").

For over three decades, courts have acknowledged that a public university's establishment of a student media outlet typically involves the creation of a limited public forum, which means

that the ability of school administrators to interfere with the speech made through such an outlet is generally strictly curtailed.[11] The Fourth Circuit, for instance, recognized the strong First Amendment rights of student journalists at public colleges in *Joyner v. Whiting*, 477 F.2d 456 (4th Cir. 1973). There, the president of North Carolina Central University withdrew the University's support for the *Echo*, a student newspaper, because of his objections to the newspaper's content. The court held that the college president's actions violated the First Amendment rights of the students who produced the college newspaper. *Id*. at 462. It explained that "[i]t may well be that a college need not establish a campus newspaper, or, if a paper has been established, the college may permanently discontinue publication for reasons wholly unrelated to the First Amendment. But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment." *Id*. at 460.

The Fifth Circuit adopted a similar view in *Bazaar v. Fortune*, 476 F.2d 570 (5th Cir. 1973). In *Bazaar*, officials at the University of Mississippi attempted to prevent publication and distribution of a student literary magazine because it used language that they considered to be inappropriate and in bad taste. The Fifth Circuit rejected the University's argument that the

---

[11] These decisions appear to be rooted in the Supreme Court's repeated admonitions that colleges play a critical role in exposing students to the "marketplace of ideas" and, as a result, First Amendment protections must be applied with particular vigilance in that context. *See, e.g.*, *Healy v. James*, 408 U.S. 169, 180 (1972) ("[W]e note that state colleges and universities are not enclaves immune from the sweep of the First Amendment. . . . [T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large."); *see also Rosenberger*, 515 U.S. at 835-36 ("[The] danger . . . to speech from the chilling of individual thought and expression . . . . is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition. . . . For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses.").

school had the same powers as a private publisher to restrict whatever content it saw fit. The court stated, "once a public school makes an activity available to its students, faculty, or even the general public, it must operate the activity in accord with First Amendment principles . . . [A] state university [cannot] support a campus newspaper and then try to restrict arbitrarily what it may publish, even if only to require that material be submitted to a faculty board to determine whether it complies with 'responsible freedom of the press.'" *Id*. at 574 (quoting *ACLU of Virginia v. Radford College*, 315 F. Supp. 893, 896-97 (W.D. Va. 1970)).

The court further explained that "[w]e are well beyond the belief that any manner of state regulation is permissible simply because it involves an activity which is part of the university structure and is financed with funds controlled by the administration. The state is not necessarily the unrestrained master of what it creates and fosters." *Id*. at 575 (citing *Antonelli v. Hammond*, 308 F. Supp. 1329, 1337 (D. Mass. 1970)). As a result, "in cases concerning school-supported publications or the use of school facilities, the courts have refused to recognize as permissible any regulations infringing free speech when not shown to be necessarily related to the maintenance of order and discipline within the educational process." *Id*. In light of the First Amendment rights enjoyed by student publications, the court found that the University could not restrict the distribution of the student magazine in the absence of special circumstances such as that the speech used was obscene or would prompt a violent disruption. Accordingly, the Fifth Circuit upheld the district court's determination that the University's interference with the publication and distribution of the student magazine violated the First Amendment.

The Fifth Circuit reaffirmed the strong First Amendment protections enjoyed by student media outlets at public colleges in *Schiff v. Williams*, 519 F.2d 257 (5th Cir. 1975). There, the

president of Atlantic University removed three editors of the student newspaper allegedly because of the newspaper's poor quality under their leadership. The University argued that, because the editors were state employees, their free speech rights could be restricted by the University if those rights were outweighed by a more significant government interest, which it identified as "the university's interest in a publication which maintained high standards of grammar and literary value so as to project a proper view of the university and its student body." *Id*. at 260. The court resoundingly rejected this argument. It held that "the right of free speech embodied in the publication of a college student newspaper cannot be controlled except under special circumstances." *Id*. The Fifth Circuit explained those special circumstances were limited to situations where the restrictions were necessary to maintain order and discipline within the educational process. The circumstances relied on by the University – poor grammar, spelling, and language expression – were "clearly not the sort which could lead to significant disruption on the university campus or within its educational processes." *Id*. at 261. Accordingly, the court affirmed the district court's finding that the University's actions had violated the student journalists' First Amendment rights.

Relying on these cases, the Eighth Circuit adopted a similar understanding of the First Amendment protections afforded college newspapers in *Stanley v. Magrath*, 719 F.2d 279 (8th Cir. 1983). In *Stanley*, the *Minnesota Daily*, the student newspaper of the Twin Cities campuses of the University of Minnesota, published an especially controversial humor issue. In response, the University's Board of Regents changed the method by which it funded the newspaper and other student publications. Whereas student publications in the past had been funded by a mandatory student fee, the Board voted to allow students to obtain a refund of this fee if they so

-21-

desired. Former editors of the *Daily*, the *Daily* itself, and the Board of Student Publication brought suit. They claimed that the Regents instituted the refundable fee system in response to the content of the humor issue and, as a result, violated the First Amendment. The Eighth Circuit agreed.

In support of its holding, the court explained, "[a] public university may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper." *Id*. at 282 (citing, *inter alia*, *Joyner*, 477 F.2d at 460). As a result, "to prevail on their First Amendment claim, the plaintiffs must show that the Regents' decision was adverse and that the decision was substantially motivated by the content of the newspaper." *Id*. As the plaintiffs demonstrated both that the decision was adverse, in that it created a chilling effect, and that it was substantially motivated by the content of the humor issue, the court held that the Regents' actions violated the First Amendment. *Id*. at 283-84.

The Fourth, Fifth, and Eighth Circuits, therefore, have adopted the position that the establishment of a student media outlet, in essence, necessarily involves the creation of a limited public forum where the only restraint is on the speakers who can participate (i.e., students) and where there can be no restrictions on the content of the outlet except with respect to content that threatens the maintenance of order at the university. Two other circuits, while also recognizing that student media outlets often enjoy First Amendment protection from interference by school administrators, have taken a less expansive view. The Sixth and Seventh Circuits agree that the establishment of a student media outlet *can* create a limited public forum but have concluded that the scope of that forum can be restricted by the school. In other words, these courts do not

consider the creation of a student media outlet as *categorically* involving the creation of a limited public forum within which students may speak on essentially any subject without fear of reprisal, but rather look to the *context* of the public university's treatment of a student media outlet, including its intent in creating the outlet and practices with respect to the outlet, in order to determine what First Amendment protection the outlet, and those that participate in it, receive. *See Hosty v. Carter*, 412 F.3d 731, 735-36 (7th Cir. 2005) (en banc); *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (en banc).[12]

Nevertheless, although the treatment of forum analysis with respect to student media outlets at public universities has differed in some respects in the various circuits, *all* the circuits that have considered the issue have determined that, at the very least, when a public university creates or subsidizes a student newspaper and imposes no *ex ante* restrictions on the content that the newspaper may contain, neither the school nor its officials may interfere with the viewpoints expressed in the publication without running afoul of the First Amendment.

We agree that, at a minimum, when a public university establishes a student media outlet and requires no initial restrictions on content, it may not censor, retaliate, or otherwise chill that outlet's speech, or the speech of the student journalists who produce it, on the basis of content or viewpoints expressed through that outlet. This holding is fully consistent with and, indeed, substantially follows from, our decisions, and those of the Supreme Court, in other cases addressing limited public fora. *See Peck*, 426 F.3d at 626; *Hotel Emples. & Rest. Emples. Union,*

_____

[12] The Sixth Circuit analysis, however, likely was limited to the circumstances presented in that case. That court expressly stated "[o]ur decision to apply the forum doctrine to the student yearbook at issue in this case has no bearing on the question of whether and the extent to which a public university may alter the content of a student newspaper." *Kincaid*, 236 F.3d at 348 n.6. In doing so, the court cited to many of the cases described above that reflect the categorical approach embraced by other circuits, including *Stanley*, *Schiff*, and *Joyner*.

-23-

*Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001); *Rosenberger*, 515 U.S. at 829.

Given our conclusion, we need not decide in this case which of the two approaches embraced by other circuits governs evaluations of the First Amendment protections afforded student media outlets at public colleges. Because CUNY had a policy in which it expressly placed no limits on the contents of student publications, under even the less protective contextual approach of the Sixth and Seventh Circuits, it is clear that the *College Voice* was a limited public forum in which there were no restrictions on the subjects that could be addressed.[13]

*B. Springer's Actions Violated Plaintiffs' First Amendment Rights*

i. The *College Voice* Constituted a Limited Public Forum

---

[13] We note that although we do not resolve precisely what type of forum analysis applies here, we have no doubt that the *College Voice* constituted a "limited public forum" and thus reject the arguments proffered by plaintiffs and amicus Student Press Law Center to the contrary. Drawing on the Supreme Court's reference to "private speakers" and "private speech" in *Rosenberger*, plaintiffs and the Student Press Law Center contend that the *College Voice* is not a public forum of any type. Rather, they assert the *College Voice* is an entirely private entity and any restrictions or retaliation taken against it should be evaluated as though the student newspaper were the *New York Times* or other similar private news organizations. This is not an accurate reading of *Rosenberger*. *Rosenberger*'s references to "private speakers" and "private speech" were employed to draw a distinction between the First Amendment restrictions that are imposed on the state when it provides funds for others to transmit its own message (i.e., where the speech involved is the government's message) and when it provides funds for others to promote their own views (i.e., where the speech involved is the message of the speakers). *Rosenberger*, 515 U.S. at 833-35; *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (recognizing the *Rosenberger*'s discussion of "private speech" refers to the speaker "not spreading state-endorsed messages"). Accordingly, while it is unquestioned that the student journalist plaintiffs in *Rosenberger* were "private speakers" in the sense that the student activity fee money they received would be used to transmit a message of their choosing, that does not mean the vehicle through which those students sought to send their message – the student publication – was itself private. Moreover, nothing in *Rosenberger* suggests that the Court conceived of the student publication there at issue as private.

Under even the less protective approach for evaluating the scope of the First Amendment rights afforded student media outlets and the students journalists who work on them, it is clear that the *College Voice* was a limited public forum in which (subject always to the existence of a compelling state interest such as the maintenance of public order) the only permissible restriction was on the speakers who could participate. CSI, through the student government, charted the *College Voice* and provided the newspaper with most of its funding through the allocation of student activity fees. The defendants agree that neither CUNY nor CSI had placed any restrictions on the subjects that could be covered in the *College Voice* or other student publications. Indeed, in earlier litigation before this court, CUNY "expressly disclaim[ed] any right of the institution to control student publications, such as those financed through student activity fees." *Leeds*, 85 F.3d at 54.

Accordingly, the policy and practice of CSI demonstrate that the school intended to open the pages of the *College Voice* to "indiscriminate use" by the students who serve as its contributors and editors, and that it thereby created a public forum in which the only limit involved the nature of permissible speakers. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983). Because the *College Voice* operated as such a forum, CSI and its officials could not, under the First Amendment, take adverse action against the student newspaper, including engaging in conduct designed to chill the speech contained in future editions, on the basis of the views expressed in the publication unless such action served a compelling government interest. *See Hotel Emples. & Rest. Emples. Union*, 311 F.3d at 545. The defendants have offered no arguments that the nullification of the May 1997 election advanced

-25-

any such interest, and we can conceive of no interest of sufficient import to justify President Springer's actions given the First Amendment concerns involved. *See infra* note 14.

ii. President Springer Canceled the Spring 1997 Election Because of the Viewpoint Expressed in the May 1997 Issue of the *College Voice*

In its May 1997 issue, the *College Voice* clearly sought to express a viewpoint on the Spring 1997 election. This viewpoint was reflected both in the election-related content contained in the issue and in the manner in which that content was presented. The substance of the *College Voice*'s election-related material made clear the newspaper's support for the positions taken by the Student Union and its belief that the candidates on that slate should be elected. In order to emphasize the strength of its view that the student body should elect candidates who supported running CSI in the manner advocated by the Student Union, the *College Voice* devoted almost its entire front cover and its complete back cover to promoting the election of candidates running on that slate, and included in the May 1997 issue the slate's platform statement as well as various exhortations urging the slate's election.

Remarks and testimony made by President Springer reveal that it was the *College Voice*'s viewpoint on the election – expressed in both the substance of its content and in the manner in which that content was presented – that led her to nullify the election. First, in announcing her decision, Springer noted the aspects of the May 1997 issue of the *College Voice* that caused her to nullify the initial Spring 1997 election included its "cover [that] boldly encourage[ed] a vote for a particular slate of candidates" and her assessment that "much of the issue was devoted to supporting an endorsed slate of candidates."

-26-

President Springer's testimony also shows that she nullified the election because of the viewpoint expressed by the *College Voice*. The following exchange occurred during President Springer's deposition:

Q: Is it your opinion that the College Voice has an obligation to present both sides of an issue?

A: Not any issue. Certainly they have a right to their opinion on issues, but as far as student elections is concerned, yes.

Q: Could you be very specific . . . I don't . . . want to mischaracterize your testimony. Are you saying that the College Voice is required to have a balanced coverage of student elections?

A: Yes.

Q: Okay. Could you describe what is your understanding of balanced?

A: Presenting both slates.

Q: When you say presenting both slates, could the College Voice favor one slate over the other and say so in writing? Could they publish that?

A: It depends on whether it was a small statement in an editorial or whether it was part of their whole issue.

Q: So, is it your testimony then that the College Voice could appropriately endorse candidates if it was done in appropriate context?

A: Yes. If the candidates were fairly presented on both sides of the slate. If it were a one-piece campaign literature, then no.

Q: So, you're saying one of your requirements . . . for fairness in coverage is to present both sides; is that correct?

A: If – yes, and honestly.

Q: . . . [Y]ou also said . . . there would be some differences as to how prominently the College Voice voiced its opinion. Is that a fair characterization of your testimony?

A: It could well be, yes.

. . .

Q: . . . Is the decision to publish an opinion on the front page with a big headline as opposed to on a back – on page 10 with a small headline, is that decision fundamentally reflecting an opinion about how important the story is?

A: I think in journalist practices it would be in that sense. But is it the editor's right to do that under these particular situations where we have regulations governing the campaign literature, no.

This exchange shows that President Springer's nullification of the election due to the May 1997 issue of the *College Voice* was premised on two types of viewpoint discrimination relating to the subject of student elections. First, Springer's action was driven by her belief that only one perspective was acceptable for speech on student elections in a student newspaper – a viewpoint that reflected a balanced view of the candidates – and that contrary views – including that certain candidates should be elected – was inappropriate. Second, Springer's testimony reveals that her nullification of the initial election was premised on her belief that the *College Voice*'s view as to the importance of electing the Student Union slate, as reflected in the presentation of the content promoting those candidates, was improper and should be excluded from the limited public forum of the student newspaper.

That the views on the student election, expressed through the substance and presentation of the content in the May 1997 issue, led to Springer's conduct is further supported by comments made by a CUNY associate general counsel during the preliminary injunction hearing before the magistrate judge. There, the CUNY attorney stated, "I think if this happened again in . . . the April 2000 elections and this identical issue came out, something [looking] like this and a student

-28-

appealed, I think the Court should have a reasonable expectation the same thing would happen. The election results would be voided." The CUNY attorney further told the magistrate judge that one way the *College Voice* could avoid such retaliation against its speech in the future would be to submit its content to the SERC for pre-publication review.

Such viewpoint discrimination is clearly impermissible in a limited public forum open to unrestricted speech on campaigns, candidates, and issues affecting CUNY. Indeed, as the Supreme Court and this court have repeatedly emphasized, once a state institution opens a limited forum to speech on a particular topic, it may not act against a speaker in that forum on the basis of views they express on that topic. *See Rosenberger*, 515 U.S. at 829 (finding that the state may not "exercis[e] viewpoint discrimination, even when the limited public forum is one of its own creation" and noting that "viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations"); *see also Good News Club*, 533 U.S. at 106-07; *Peck*, 426 F.3d at 626; *Hotel Emples. & Rest. Emples. Union*, 311 F.3d at 545. Yet, that is exactly what happened here: the *College Voice* was a limited public forum open to speech related to the Spring 1997 election and to which candidates should be elected, the *College Voice* expressed views on those subjects in its May 1997 issue, and Springer, by canceling the election, engaged in adverse action because of the views the newspaper offered.[14]

---

[14] Under the strict scrutiny applicable to government actions that impose such viewpoint discrimination, these actions would be permissible only if they served a compelling government interest and were narrowly tailored to achieve that interest. *See Hotel Emples. & Rest. Emples. Union,* 311 F.3d at 545. As mentioned above, however, and as the district court correctly noted, the defendants have made "no effort to show that [Springer's] actions were supported by a compelling state interest, or that there were [no] less intrusive alternatives to her decision to the nullify the election results."

-29-

### iii. The Defendants' Arguments For Why President Springer's Actions Did Not Violate the First Amendment Are Unavailing

*a. The Nullification of the Election Created a Chilling Effect and Thus Violated the First Amendment*

Defendants assert that any harm the plaintiffs may have suffered as a result of the nullification of the election does not rise to the level of cognizable constitutional injury. This argument is entirely without merit. When a state university official takes retaliatory action against a newspaper for publishing certain content in an effort to force the newspaper to refrain from publishing that or similar content in the future, the official's action creates a chilling effect which gives rise to a First Amendment injury. *See Stanley*, 719 F.2d at 283. Here, the record establishes that Springer's nullification of the election created just such a chilling effect.

As the district court explained, "there was a concrete action taken in nullifying a student election because of a publication supportive of a particular slate of candidates which won the election. The threat or chill that plaintiffs assert they felt regarding future issues of the newspapers is not merely subjective, but has already been experienced." In the wake of President Springer's actions in Spring 1997, the *College Voice* scaled back its coverage of elections and reduced the prominence and extent of its candidate endorsements in an effort to avoid provoking another election nullification. Accordingly, although Springer's actions did not entail impoundment of the May 1997 issue, the denial of funding, or the express prohibition of election coverage, her conduct nevertheless violated the plaintiffs' First Amendment rights as a result of the chill on student speech that it created. *See Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) ("It is well-established that First Amendment rights may be violated by the chilling effect

-30-

of governmental action that falls short of a direct prohibition against speech." (internal quotation marks omitted)).

*b. The May 1997 Issue Did Not Constitute Candidate Speech Nor Did Its Content Violate Applicable Election Rules*

The defendants contend, however, that the front and back covers of the May 1997 issue of the *College Voice*, as well as the candidate position statements included in the inside of the issue, did not constitute the newspaper's speech, but rather was the speech of the candidates themselves. The defendants argue that President Springer nullified the election because of this method of *candidate* speech, which, they assert, violated the governing election rules by essentially creating 5,000 flyers for the Student Union candidates. This claim is unconvincing.

First, as the defendants concede, the *College Voice* was entitled to endorse candidates in the May 1997 student government elections. They further concede that there were no prohibitions against candidates also serving as editors or staffers on the *College Voice* or against such candidates endorsing themselves. As a result, it cannot be that the newspaper's endorsement of candidates who were also members of its staff converted those endorsements from "newspaper speech" to "candidate speech." Furthermore, the record in this case reflects that the *College Voice* editors who chose (1) what election-related content to include in the May 1997 issue, (2) which, if any, candidates to endorse, and (3) how to lay out the election-related content in that issue were not running in the election. In other words, the choice to speak in the way challenged by the defendants was not made by any of the candidates.

-31-

Alternatively, in making this argument, the defendants may be asserting that content such as platform statements, slogans, and exhortations to vote for candidates is necessarily candidate speech, even if technically selected for inclusion in a publication by non-candidates. This position seems premised on an improperly narrow view – in light of the nature of the forum at issue – of what speech is encompassed in media coverage of an election. Moreover, it appears to stem from an impoverished understanding of the different *types* of media outlets that cover an election or politics, and the nature of content inherent in those outlets: In addition to outlets that offer "balanced" coverage, there are those that adopt a specific point of view and that – throughout the publication (i.e., not just on the editorial page) – provide content urging readers to embrace that view. To take national media outlets as examples, in addition to *USA Today*, which describes itself as offering the type of balanced views of an election that President Springer evidently favors, there are partisan media organizations, such as the *Nation* and the *Weekly Standard*, which regularly aggressively endorse their chosen candidates, parties, and ideas, and demonstrate their endorsements by, *inter alia*, reprinting that party's platform or putting a candidate's picture on the cover and urging readers to vote for him or her. These various news organizations all offer different perspectives, or views, on an election, but the latter's coverage is no more "candidate speech" than the former's.

In other words, the fact that a news outlet adopts and zealously promotes the views of the candidates or party it supports and aggressively urges the election of those candidates, or the fact that such speech, unsurprisingly, would tend to benefit those candidates, does not transform the media outlet's speech into candidate speech.

-32-

In any event, the *College Voice*'s publication of the election-related content in the May 1997 issue did not violate any germane election rules. The two rules that the defendants assert justified President Springer's actions are Elections Rules 2 and 5. Rule 2 provided: "The campus newspaper may not be used as posters on walls, bulletin boards, etc. and may not be used as a means to distribute campaign flyers." Rule 5 stated: "The Student Government will be glad to make you 30 copies of your stamped and approved poster or flyer. All candidates must remove their election materials from the designated areas after the election is over." As the district court clearly and correctly explained, neither of these rules precluded the *College Voice* from publishing the election-related content in its May 1997 issue. We cannot do better than to restate that court's discussion:

> The only Rules that President Springer relied on and that defendants say are relevant, Election Rules 2 and 5, define the responsibility of the individual student candidates, not the scope of the content of the college newspapers. . . . The Rules do not, explicitly or even implicitly, preclude campus newspapers from endorsing candidates or running platform statements. There is nothing in the rules concerning "balanced" coverage, the "context" of editorials, or the placement of headlines or platform statements. Indeed, implicit in Rule 2's requirement that candidates should not use the newspapers as posters is the acknowledgment that the papers may contain favorable opinions and support for a candidate that he or she would *want* to post on a bulletin board. That Rule 5 provides that the student government will print and pay for 30 posters or flyers imposes no restriction on the number of issues of the school newspaper which may contain an endorsement. *There are simply no written guidelines to establish that what was printed in the May 1997 issue of the* College Voice *was prohibited*.

(second emphasis added).

We agree entirely with the district court's reading of the rules and therefore reject defendants' arguments that Springer's actions were no more than the content-neutral enforcement of the election regulations adopted by the SERC.

*c. President Springer's Actions Cannot Be Justified as Necessary to Ensure Viewpoint Neutrality in the Administration CSI's Student Activity Fees Fund*

The defendants further argue that President Springer's actions were justified by her duty "to address[] the potential First Amendment violation arising from the use of the mandatory Student Activity Fee to favor the viewpoint of the candidate Plaintiffs over that of other candidates." This argument misapprehends how viewpoint neutrality requirements apply to mandatory student activity fees. The defendants are correct that when a state college implements a mandatory student activity fee, its procedure for allocating the funds that fee generates must be viewpoint neutral. This is totally different from, and in no way means, that the college has a duty to ensure that the positions expressed by the recipients of the fees reflect a balance of viewpoints. Far from it; as long as the availability of the funds to student groups *is not restricted based on their viewpoint*, the college's administration of a mandatory student activity fee complies with the neutrality requirement demanded by the First Amendment. *See Board of Regents v. Southworth*, 529 U.S. 217, 232-33 (2000) (citing *Rosenberger*, 515 U.S. at 841).

Here, the fact that the *College Voice* expressed a particular viewpoint did not create a First Amendment concern relating to viewpoint neutrality with respect to CSI's administration of the student activity fee funds. No one disputes that the CSI student activity fee funds were distributed based on viewpoint-neutral criteria. Nor does any party dispute that the candidates on the rival slate, SFS, could have founded a newspaper that promoted their views and received student activity fee funds for it. (Indeed, the other campus newspaper at CSI, which also received student activity fee funds, was created by students who objected to the viewpoints espoused by the *College Voice*.) The fact that the supporters or candidates of the rival slate did

-34-

not seek a student-activity-fee-supported media outlet of their own in no way means that the *College Voice*'s use of the student activity fee funds to express its views gave rise to a viewpoint neutrality issue regarding CSI's administration of the student activity fee fund. No one has here suggested any violations of the requirement that the student activity fee fund be administered in a viewpoint neutral manner. As a result, there was no abuse for President Springer to correct. Rather, far from remedying a (non-existent) viewpoint neutrality problem, President Springer's actions created (a very real) one.

***

We conclude that President Springer's nullification of the Spring 1997 election violated the plaintiffs' First Amendment rights.

**II. The Qualified Immunity Question Cannot be Resolved at Summary Judgment**

Defendants argue that even if President Springer violated plaintiffs' First Amendment rights, she is nevertheless entitled to qualified immunity. The district court agreed and granted the defendants summary judgment on this ground. We, however, find that the district court's otherwise admirable opinion erred in this respect because material factual issues relevant to the qualified immunity question are in dispute.

A government official sued in his official capacity is entitled to qualified immunity in any of three circumstances: (1) "if the conduct attributed to him is not prohibited by federal law"; (2) "where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by

-35-

the defendant was not clearly established at the time of the conduct"; or (3) "if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *See Sadallah v. City of Utica*, 383 F.3d 34, 37 (2d Cir. 2004) (internal quotation marks and alteration omitted). "Summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (internal quotation marks omitted).

Neither of the first two grounds for qualified immunity apply in this case. As explained in the previous section, President Springer's nullification of the election in response to the content published in the *College Voice* was prohibited federal law. And the plaintiffs' right not to be subjected to her actions was clearly established in the spring of 1997. This court has explained that, in determining whether a right is clearly established for qualified immunity purposes, "the right . . . need not be limited to the specific factual situation in which that right was articulated." *Papineau v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006). This is because "the Supreme Court has declined to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, and has, instead, chosen a standard that excludes such immunity if in the light of pre-existing law the unlawfulness [is] apparent." *Id*. (citing *Back v. Hastings on Hudson Union Free Sch. Dist*., 365 F.3d 107, 129 (2d Cir. 2004)) (internal citations and quotation marks omitted).

-36-

The state of the law in Spring 1997 was such that, when President Springer nullified the election in response to the content published in the *College Voice*, it was clear that her actions violated the First Amendment rights of the student journalists. There can be no question that a reasonable official in President Springer's position should have been aware that the *College Voice* was a public forum, limited only with respect to the speakers who could participate and not with regard to the subject matters on which the newspaper could discuss, and thereby entitled to protection under Supreme Court law governing such fora. CUNY's general counsel office had distributed a memorandum to the presidents of colleges in the CUNY system in 1995, including President Springer, that expressly identified students newspapers and other publications as limited public fora. And, in a separate case that involved the status of student publications at CUNY schools and that predated Springer's election nullification, our court recognized that CUNY "expressly disclaim[ed] any right of the institution to control student publications, such as those financed through student activity fees." *Leeds*, 85 F.3d at 54.

And, the law governing impermissible restrictions on speech in a limited public forum such as the *College Voice* was also plainly apparent at the time of President Springer's actions. The Supreme Court had directly addressed the First Amendment rights to which speakers in such a forum were entitled in 1995. Thus, in *Rosenberger* the Supreme Court made clear that when a state creates a limited public forum related to student media outlets, such as the *College Voice*, it is not permitted to discriminate against speech made in that forum (including speech made by a student media outlet with a particular perspective on subjects open for discussion in the forum) based on viewpoint. 515 U.S. at 831-32. In explaining its decision, the Supreme Court stated that the prohibition on viewpoint discrimination was rooted in longstanding "[v]ital First

-37-

Amendment speech principles," including the need to protect against the "danger" of "chilling" student speech. It added that for a public college "to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Id.* at 836 (citing *Healy v. James*, 408 U.S. 169, 180-81 (1972) ; *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967)).

In the spring of 1997, therefore, it was evident that the *College Voice* was a limited public forum open to speech on any topic. It also was plain that the First Amendment prohibited a public college official from engaging in viewpoint discrimination within such a forum, and that actions taken by a college official that chilled protected speech within that forum violated the First Amendment. Accordingly, although no court had specifically held at the time that the *nullification of an election* on the basis of views expressed by a student newspaper violated the First Amendment where such nullification chilled future speech, the "unlawfulness" of Springer's actions was "apparent" "in the light of pre-existing law." *See Back*, 365 F.3d at 129. And the "contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.").[15]

_____

[15] The district court's only basis for finding that Springer was entitled to qualified immunity – its view that a court must have *specifically held* prior to Springer's actions *that nullifying a student election* on the basis of views expressed by a student newpaper *violated the First Amendment* for it to be clearly established that plaintiffs had a constitutional right not to be subject to such

-38-

Because President Springer's conduct violated clearly established law, she is entitled to qualified immunity only if it was objectively reasonable for her to believe that her actions were lawful at the time she nullified the election. *See Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). Defendants assert that President Springer decided to nullify the election because she believed doing so was necessary to vindicate Election Rules 2 and 5.

Although we, like the district court, conclude that those rules did not justify Springer's conduct, it is possible that a jury might find that it was "objectively reasonable" for Springer, at the time she acted, to believe that her nullification was the lawful implementation of these content-neutral election rules. But, while such a conclusion *by a jury* may be permissible, it nonetheless is inappropriate for a court, at the summary judgment stage, to find that Springer is entitled to qualified immunity on this basis.

First, we have noted that "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). Here, there is a dispute as to whether and to what extent President Springer relied on any of the rules cited when she made her decision to cancel the election. The nature of this dispute is ably described in the magistrate judge's second Report and Recommendation, where that judge examined the defendants' claim that President Springer had relied on Election Rule 2.

conduct – was, therefore, in error. Significantly, the defendants do not address this basis for qualified immunity, i.e., whether the contours of the First Amendment right Springer violated were clearly established in 1997. Instead, the only argument the defendants make on appeal with respect to qualified immunity is that "President Springer . . . took no action against a student publication, much less an action in response to a viewpoint espoused by a student publication" and, as a result, she is entitled to qualified immunity. The argument that Springer did not take action against the *College Voice* based on its viewpoint is unconvincing for the reasons described in the previous section.

-39-

The magistrate judge noted that the defendants "[i]nitially … relied solely on an argument that the decision was well within President Springer's inherent authority to regulate student government elections and ensure a fair election process" and that they failed "to even make reference to [Rule 2] or to any regulation specifically prohibiting student funded newspapers from being used as campaign literature" until they raised the claim before the district court after the magistrate judge had recommended that plaintiffs be granted a preliminary injunction. The magistrate judge also pointed out that the defendants had offered "shifting" explanations before the magistrate and the district court of how much President Springer relied on Rule 2, which, the magistrate judge concluded, "raises serious questions of material fact as to what extent, if any, President Springer relied on [Rule 2] in reaching her determination" to cancel the election. As a result, the magistrate judge found that it is "clear that there is a disputed issue of fact that would preclude summary judgment on the issue of whether President Springer relied on [Rule 2] in making her decision."

The concerns the magistrate judge expressed with respect to whether President Springer did in fact rely on Rule 2 apply equally to her asserted reliance on Rule 5. Defendants did not assert that President Springer relied on Rule 5 when deciding to nullify the election until well after the litigation was underway. And they have offered shifting explanations for the role that rule played in her decision over the course of this action.

In light of the disputed issues of material fact regarding President Springer's reliance on the election rules, summary judgment on the defendants' qualified immunity claim cannot be granted. *See Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006) (citing *Kerman v. City of*

*New York*, 374 F.3d 93, 109 (2d Cir. 2004)) ("If there is a material question of fact as to the relevant surrounding circumstances, the question of objective reasonableness is for the jury.").

Second, even if there were no factual dispute regarding President Springer's reliance on the election rules, it would still be inappropriate to resolve the qualified immunity question on summary judgment. We noted that a jury *might* find that it was objectively reasonable for Springer to believe that a nullification of the election on the basis of the election rules was lawful, because such nullification involved only the enforcement of content-neutral regulations. But a reasonable jury could equally well conclude the opposite, i.e., that any reliance on the rules was not an objectively reasonable basis for nullification of the election. And we have held that "[s]ummary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert*, 331 F.3d at 37 (internal quotation marks omitted).

In other words, we cannot say, at the summary judgment stage, that Springer did in fact rely on Rules 2 and 5 in deciding to nullify the election. Nor can we say that even if she did so rely, a reasonably jury would be compelled to find such reliance objectively reasonable. Given these considerations, we conclude that the district court erred when it granted summary judgment to President Springer on the ground that she was entitled to qualified immunity. We therefore vacate the district court's grant of summary judgment.

**III. The District Court Properly Dismissed the Student Government Defendants**

Finally, plaintiffs challenge the district court's decision to grant the motion of the Student Government Defendants to dismiss the claims against them because they were not state actors. We affirm the district court's dismissal of these defendants.

A private individual may be treated as a state actor for purposes of a constitutional challenge to his conduct only if his actions are "'fairly attributable to the state.'" *Leeds*, 85 F.3d at 54 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). "Extensive regulation and public funding, either alone or taken together, will not transform a private actor into a state actor; instead, the state must have exerted its coercive power over, or provided significant encouragement to, the defendant before the latter will be deemed a state actor." *Id.*; *see also San Francisco Arts & Ath. v. United States Olympic Comm.*, 483 U.S. 522, 547 (1987). A private entity does not become "a state actor merely because its conduct is authorized by a state law, where its conduct is not *compelled* by the state." *Loce v. Time Warner Entertainment Advance/Newhouse Pshp.*, 191 F.3d 256, 266 (2d Cir. 1999) (emphasis added).

Here, plaintiffs have made no allegations that would permit the inference that the school authorities coerced or encouraged Student Government Publications Commissioner Schnetzer to impound the May 1997 issue, or coerced or encouraged the other Student Government Defendants to support his decision. In fact, according to the plaintiffs, when the school administrators learned of Schnetzer's actions, they urged him and the rest of the members of the Student Senate to rescind the impoundment. When the Student Government Defendants refused to do so, President Springer overruled their decision.[16] Accordingly, it cannot be said that the

---

[16] Plaintiffs also argue that the Student Government Defendants were state actors because they exercised a power "traditionally [within] the exclusive prerogative of the state," *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974); *see also Blum v. Yarestky*, 457 U.S. 991, 1012 (1982), or because their actions were inextricably interwoven with the actions of CSI

-42-

school officials even acquiesced to the Student Government Defendants' actions, keeping in mind that such acquiescence would still be insufficient to demonstrate that the Student Government Defendants were state actors. *See San Francisco Arts & Ath.*, 483 U.S. at 547.

Despite these facts, the plaintiffs insist that the Student Government Defendants were state actors because the Student Senate's existence and its power to regulate student organizations, including the *College Voice*, derive from the CUNY Bylaws and CSI Governance Plan. But, assuming that state law or regulations gave the Student Government Defendants the power to act as they did, these laws and regulations certainly did not require the Defendants to do so. As a result, the state authorization was insufficient to establish that the Student Government Defendants were state actors in the circumstances presented here. *See Loce*, 191 F.3d at 266.

We therefore find that the district court correctly concluded that, in the circumstances presented in this case, the Student Government Defendants were not state actors and properly dismissed them as defendants.

CONCLUSION

---

administrators, *Amidon v. Student Ass'n of the State Univ. of N.Y. at Albany*, 399 F. Supp. 2d 136, 145 (N.D.N.Y. 2005) (finding that Student Government "clearly acts in concert with the state to create a forum for the exercise of First Amendment rights. The SA determines the amount of the fee. The state collects it, enforces its payment, and turns it over to the SA. The SA distributes the money pursuant to state regulation and approval"). These arguments, however, are belied in this case given Present Springer's unilateral decision to overrule the SERC's order impounding the *College Voice*.

For the foregoing reasons, we VACATE the district court's grant of summary judgment to President Springer based on her qualified immunity and REMAND for further proceedings. We AFFIRM the district court's dismissal of the Student Government Defendants.[17]

---

[17]We note that at oral argument, counsel for plaintiffs conceded that the only relief sought in this litigation is nominal damages. We do not decide at this time the significance of that concession with respect to the determination of attorney's fees in light of *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 484 F.3d 162 (2d Cir. 2007), and related cases. *See, e.g.*, *Farrar v. Hobby*, 506 U.S. 103, 114-15 (1992); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 n.5 (2d Cir. 1999)).

DENNIS JACOBS, *Chief Judge*, concurring in part and dissenting in part:

I concur in the majority's result insofar as it affirms the dismissal of some claims, but I dissent insofar as it reverses the grant of qualified immunity.

I concede that this short opinion of mine does not consider or take into account the majority opinion. So I should disclose at the outset that I have not read it. I suppose this is unusual, so I explain why.

\* \* \*

The majority has fulfilled its responsibility to explain at some length its vacatur of a part of the district court's judgment. But this is not a case that should occupy the mind of a person who has anything consequential to do. In a nutshell, the editors of the *College Voice* student newspaper used it as a campaign flyer to promote the self-styled radicals of the "Student Union" party in a long-ago student election, and the college president, finding that the partisan use of student-activity funds made a mockery of the election rules, directed that the election be re-run. The gist of the complaint is that the editors' speech was chilled, which is deemed to be a bad thing.

This is a case about nothing. Injunctive relief from the school's election rules is now moot (if it was ever viable); and plaintiffs' counsel conceded at oral argument that the only relief sought in this litigation is nominal damages. Now, after years of litigation over two dollars, the majority will impose on a busy judge to conduct a trial on this silly thing, and require a panel of jurors to set aside their more important duties of family and business in order to decide it. *See Amato v. City of Saratoga Springs*, 170 F.3d 311, 322-

–45–

23 (2d Cir. 1999) (Jacobs, *J.*, concurring) (noting that a trial over one dollar is a "wasteful imposition on the trial judge and on the taxpayers and veniremen").

      With due respect to my colleagues in the majority, and to whatever compulsion they feel to expend substantial energies on this case, I fear that the majority opinion (44 pages of typescript) will only feed the plaintiffs' fantasy of oppression: that plutocrats are trying to stifle an upsurge of Pol-Potism on Staten Island. Contrary to the impression created by the majority's lengthy formal opinion, this case is not a *cause célèbre*; it is a slow-motion tantrum by children spending their graduate years trying to humiliate the school that conferred on them a costly education from which they evidently derived small benefit. A selection from the illiterate piffle in the disputed issue of the *College Voice* is set out in the margin for the reader's fun.[1]

---

[1] One student journalist laments that he is no longer the friend of the incumbent president of the student government: "I am very sad today. I lost a friend; his name is Joe Canale. . . . Things changed on April 9, 1997. It was a pizza day I won't forget. . . . Joe did not shake my hand and all he said to me, in a rather drone voice, was 'Getting ready for the elections?' From that point on I knew, Joe had disowned me, all because of my affiliation with [the Student Union]. . . . 'When I found out he renounced my friendship, because of my affiliation with Student Union, I adopted the slogan 'Joe Must Go' to console me in my hour of need.'"

Another article denounces "pizza politics": free pizza at student events is "another of the perverse policies set forth by this bureaucratic institution. The pizza is most certainly not 'free'. It was paid for, in full, by the student body of the College of Staten Island, it belongs to them. The pizza is the property of the student body, not of the student government." The same writer is agitated by a student-government planned "Solidarity/Unity Fest" which included a "velcro wall, a climbing mountain, a gladiator joust, a laser tag maze, human bowling, a bungee run, a velcro wall [another velcro wall?], human fooseball [sic], face painters, jugglers, mimes, 12 different carnival style games and things of that nature." According to the author, this "Fest" was an "attempt[] to coerce votes out of the student body in exchange for carnal pleasures." The article closes with a call to "end the evil tyranous [sic] reign of the current [student government] by whatever means necesaary [sic]."

The paper's coverage of a "so-called Mayoral Forum" complains that the two political parties "have historically been slaves to the Wall Street corporate tycoons, while either ignoring or killing the working class and poor people of this city and nation."

An editorial sets out the goals of the paper: "We oppose the poisonous divisions fostered

* * *

On the merits, I would affirm for the reasons given in Judge Gershon's careful and thorough opinion (which I *have* read).

President Springer's decision to re-run the election was (to apply the governing standard) not unreasonable in light of clearly established law. The school adopted election rules intended to level the playing field and limit the use of student-activities funds for election-related purposes. President Springer's decision was based on her view that the May 1997 issue of the *College Voice* was "a thinly veiled student activity fee funded piece of campaign literature for the Student Union slate." The majority remands for a trial on whether the college president acted on an impermissible belief that a school newspaper funded by (compelled) student-activities fees should be balanced.

I think that the First Amendment protects the freedom of the press and that this protection should be strongest when a newspaper prints election-related content at election time. But this area of the law is (unfortunately) far from clear.

In 2003, six years *after* the student-government election at issue, the Supreme Court upheld numerous limitations on speech during election time – in an opinion that could open the way to direct regulation of a newspaper if its election coverage becomes

on the basis of race by the bosses, who make Black and white workers fight each other for the crumbs off their table . . . even though it is the workers who produce all the wealth." The paper "seeks to engage all those who are committed to fighting exploitation and oppression in common action against the common enemy...capitalism." (ellipsis in original).

The issue features the Student Union's "12-Pt. Program For Change," including a call to "END CORPORATE CONTROL OF THE BOOKSTORE" so that it can "be returned immediately to the student body." The reason: "CUNY in general and CSI in particular have become the crown jewel in [Barnes & Noble's] campaign of corporate terror."

too "slanted" or "biased." *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 283-86 (2003) (Thomas, *J.*, concurring in part and dissenting in part). In 2004, this Court upheld a state election law that provided for the regulation of news stories about candidates based on the discretionary rulings of the law's administrators. *See Landell v. Sorrell*, 382 F.3d 91, 181-82 (2d Cir. 2004) (Winter, *J.*, dissenting), *rev'd sub nom. Randall v. Sorrell*, 126 S. Ct. 2479 (2006). That discretion to ensure a "fair" election is the same kind of discretion that President Springer exercised here.

In this light, it cannot be said that in 1997 there was a clear line between [i] a viewpoint-based reprisal against a campus newspaper and [ii] the implementation of neutral and constitutional election standards. In any event, a school administrator should not have to become a constitutional-law professor in order to save herself from personal liability when giving a needed lesson in fair play.

* * *

This prolonged litigation has already cost the school a lot of money that could better have been spent to enrich course offerings or expand student day-care. If this case ends with a verdict for plaintiffs (anything is possible with a jury), the district court will have the opportunity to consider whether the exercise merits an award of attorneys' fees in excess of one-third of two dollars.